[Civ. No. 2971.   Third Appellate District—December 23, 1925.]

## PRODUCERS FRUIT COMPANY OF CALIFORNIA (a Corporation), Appellant, v. M. C. GODDARD, Respondent.

[1] SALES—BREACH OF CONTRACT—ACTION FOR DAMAGES—FINDINGS—EVIDENCE.—In this action against a peach grower for damages for alleged breach of contract for the sale to plaintiff of certain varieties of defendant's peaches for a term of years, in which defendant pleaded an oral modification of such agreement by plaintiff's ostensible agent, the evidence was such that the court could not say, as a matter of law, that the jury was not warranted in finding the vital facts favorably to defendant.

[2] ID.—OSTENSIBLE AGENCY—FAILURE TO EXERCISE ORDINARY CARE.—In such action, the facts and circumstances shown by the evidence were sufficient to establish in the mind of defendant, and in warranting the jury in so finding, that plaintiff held its representative out as its agent in the county in which defendant was located, with plenary power as such, to make for it contracts for the handling of fruit grown in said county; and even though the circumstances were not such as to show that plaintiff intentionally caused third persons in said county to believe said representative to be possessed of such power, they were allowed to so believe by the want of ordinary care on the part of the plaintiff.

[3] ID.—AUTHORITY OF AGENT—RATIFICATION—EVIDENCE.—In such action the question of the authority of said agent to make and bind plaintiff by the subsequent oral agreement with defendant was without material significance, where the evidence showed that plaintiff ratified said oral agreement, in that for two years thereafter it accepted and disposed of all the fruit grown on defendant's ranch, in accord with the terms of said oral agreement.

[4] ID.—STATUTE OF FRAUD—VALIDITY OF CONTRACT.—An agreement or contract within the provisions of the statute of frauds, if otherwise valid, is not, merely because it is not in writing, invalid in the sense that it is void, but is as effective as to all the purposes for which it has been made as is such an agreement whose terms have been committed to writing until its enforcement is voided upon the ground that it is not in writing.

---

2. See 1 Cal. Jur. 743.
3. See 1 Cal. Jur. 767.
4. See 12 Cal. Jur. 922; 25 R. C. L. 692.

[5] ID. — WAIVER OF DEFENSE. — The statute of frauds relates to the remedy only, and a defense based thereon may be waived.

[6] ID. — NOVATION — INTENTION — NEW AGREEMENT. — The question whether a novation has taken place is always one of intention; and where it satisfactorily appears that a new agreement was intended by the parties to take the place of an existing one, it necessarily follows that the old agreement has been entirely abrogated or extinguished.

[7] ID.—ABANDONMENT OF WRITTEN CONTRACT—PAROL EVIDENCE.—The abandonment or extinguishment of a written contract by the mutual agreement of the parties may be shown by parol; and where an oral agreement is substituted for an existing written agreement, section 1698 of the Civil Code has no application.

[8] ID.—AGREEMENT TO REDUCE CONTRACT TO WRITING—EVIDENCE—IMPLIED FINDINGS — STATEMENT OF SALES — WRITTEN ACKNOWLEDGMENT.—The evidence having been in sharp conflict upon the question whether the parties had agreed that, in the making of said subsequent agreement, it should not bind the parties until its terms were reduced to writing, and the instructions to the jury upon that question having been direct and explicit, the verdict in favor of defendant constituted an implied finding that it was not understood or agreed that the terms of such subsequent agreement should be committed to writing and signed by the parties before it should become operative or binding upon them; but even though such subsequent agreement was to be put in writing, the written statement delivered to defendant by plaintiff and signed by the latter of the sales of defendant's fruit in accord with the terms of such subsequent agreement, in effect, constituted at least an acknowledgment in writing of the making of said agreement.

[9] ID. — CONSTRUCTION OF CONTRACT — DECLARATIONS OF PLEADER — NOVATION—TRIAL THEORIES—APPEAL.—The courts are not bound by the construction the pleader may give to a written or an oral contract declared upon or set up as a defense, or the pleader's conception of the legal nature or effect thereof; and where a defendant in his answer pleads an oral agreement, which he characterizes as a modification of a prior written agreement, and the case is tried upon two theories, one, that such oral agreement involved a modification of the existing agreement, and the other, that it wrought a novation, and the evidence establishes the oral agreement as a new agreement between the parties relative to the same subject as the prior written agreement, the appellate court is not

5.  See 12 Cal. Jur. 941.

6.  See 20 Cal. Jur. 249; 8 R. C. L. 366.

7.  See 6 Cal. Jur. 377.

required to decide the case on the theory that the oral agreement only involved an attempted modification of the prior written agreement.

[10] ID. — EVIDENCE — VERDICT — INSTRUCTIONS — MISCARRIAGE OF JUSTICE.—In such action, the verdict of the jury in favor of defendant having been in accord with the correct theory that the oral agreement wrought a novation, and having been evidentially well supported upon that theory, it could not be said that a miscarriage of justice resulted from the failure or refusal of the jury to follow certain instructions framed upon the theory that the oral agreement constituted and effected a mere alteration of the original agreement and which were given at the request of plaintiff.

[11] ID.—THEORY OF DECISION ON APPEAL—ABSENCE OF DISCUSSION IN REPLY BRIEF.—In such action, the appellant cannot justly complain because the case is decided on appeal upon the theory that the oral agreement wrought a novation, where respondent presents that question in his brief, and counsel for appellant, in their reply brief, notice that fact, but refuse to discuss the question, claiming that the proposition was not an issue in the case.

[12] ID. — INCONSISTENCIES IN TESTIMONY — PROVINCE OF JURY. — Apparent inconsistencies in the testimony of witnesses concern particularly the question of their credibility or the weight of their testimony, which it is for the jury to settle. (On denial of rehearing.)

[13] ID.—ABANDONMENT OF WRITTEN CONTRACT—INTENT—PAROL EVIDENCE.—The fact that a written contract has been abandoned or canceled may be shown by parol, and, while the terms of the oral agreement, in so far as they are executory, may not be enforced, if the agreement was that they should be committed to writing before they should become binding, the fact that the parties themselves act upon and in accord with the terms of the oral agreement, it having been expressly understood that said oral agreement was to supersede or be substituted for the old or existing agreement, is competent proof of the intention to abandon and cancel and consequently of the fact of the abandonment and cancellation of the written agreement.   (On denial of rehearing.)

[14] ID.—INVALID AGREEMENT—QUANTUM MERUIT.—Assuming that the oral agreement for the purchase of defendant's fruit was invalid, he was entitled to maintain an action upon a *quantum meruit* for the reasonable value of the fruit which he delivered to plaintiff under the oral agreement, and the prices received by plaintiff

---

13.   See 27 Cal. Jur. 182; 28 R. C. L. 657.

14.   See 6 Cal. Jur. 377.

for said fruit, minus the commissions and loading charges, constituted the reasonable value of said fruit. (On denial of rehearing.)

(1) 4 C. J., p. 772, n. 89, p. 852, n. 57. (2) 14a C. J., p. 349, n. 48, p. 352, n. 69, p. 353, n. 70, p. 407, n. 22. (3) 2 C. J., p. 954, n. 81; 14a C. J., p. 410, n. 27; 29 Cyc., p. 1139, n. 68. (4) 27 C. J., p. 310, n. 4. (5) 27 C. J., p. 337, n. 54. (6) 29 Cyc., p. 1135, n. 33. (7) 13 C. J., p. 594, n. 41, 48. (8) 4 C. J., p. 858, n. 3. (9) 31 Cyc., p. 53, n. 88 New. (10) 4 C. J., p. 1055, n. 47 New. (11) 3 C. J., p. 1435, n. 42 New. (12) 38 Cyc., p. 1516, n. 57, p. 1518, n. 69, p. 1520, n. 70, 71, 74, 75. (13) 13 C. J., p. 292, n. 25 New, p. 772, n. 67, p. 773, n. 69, p. 780, n. 36. (14) 35 Cyc., p. 535, n. 16 New, p. 580, n. 35.

APPEAL from a judgment of the Superior Court of Placer County. J. B. Landis, Judge. Affirmed.

The facts are stated in the opinion of the court.

Devlin & Devlin for Appellant.

Dozier, Kimball & Dozier for Respondent.

HART, J.—The plaintiff is a corporation, organized and existing under and by virtue of the laws of the state of California. The defendant is a resident of Placer County, this state, and is and has been for many years a fruit grower in said county.

On or about the first day of March, 1917, the defendant entered into an agreement in writing with the Producers Fruit Company, a corporation, whereby the former agreed to sell and the latter agreed to buy the crop of Levi and Phillips Cling peaches grown by the defendant on his fruit ranch in said county during the year 1917 to 1926, inclusive, covering a period of ten years, the same "to be delivered by the seller," as the complaint alleges, "at his own expense to the shipping house of the buyer, at Loomis, California, at the following prices: No. 1 Phillips Cling, $27.50 per ton net; No. 1 Levi Cling, $25.00 per ton net; No. 2 Phillips Cling, $13.75 per ton net; No. 2 Levi Cling, $12.50 per ton net."

The above contract, with all the rights of the said Producers Fruit Company thereunder, was, prior to the year 1922, assigned and transferred to the plaintiff herein.

The complaint alleges that the defendant failed and refused to deliver to the plaintiff, as said contract required, the crop of peaches of the varieties named therein for the year 1922, although, it is further alleged, there were produced in said year upon defendant's fruit ranch 22½ tons of No. 1 Phillips Cling peaches, 2½ tons of No. 2 Phillips Cling peaches, 112½ tons of No. 1 Levi Cling peaches and 12½ tons of No. 2 Levi Cling peaches; that the market value of said 1922 crop of Phillips and Levi Cling peaches was $60.00 per ton for number one's and $30.00 per ton for number two's. The complaint alleges that, because of the failure and refusal of defendant to deliver the above specified crops of peaches for the year 1922, the plaintiff was and is damaged in the sum of $4,928.13, for which amount judgment is prayed.

Answering the complaint, the defendant admits the making of the contract therein referred to and expressly made a part thereof, but denies all other material allegations of said pleading, and then sets up a special defense, as follows:

"That prior to the commencement of the above-entitled action, and on or about the 17th day of October, 1919, the said agreement was altered as hereinafter stated, by the mutual consent and agreement of this defendant and the plaintiff herein; that on or about the 17th day of October, 1919, it was mutually understood and agreed by and between plaintiff and defendant that the said defendant did then and there sell and agreed to deliver to plaintiff during the then coming seasons of the years 1920 to 1926, inclusive, all of the fruit grown on said ranch, and that said plaintiff did then and there purchase from and agree to pay to the said defendant therefor the prevailing market price for said fruit at the times of such deliveries, less loading charges for canning fruit of $2.50 per ton and less a commission of 7% on all other fruit; and this defendant made and entered into said last-mentioned agreement with said plaintiff because of the desire of said plaintiff to purchase from this defendant all of his shipping fruit, in

addition to the canning fruit covered by said contract of March 1, 1917; that this defendant during the years 1920 and 1921, did perform all of the terms and conditions of said contract as so altered and on his part to be performed, and delivered to said plaintiff all of the fruit grown on said ranch during the seasons of 1920 and 1921, but the said plaintiff has failed, neglected and refused and still fails, neglects and refuses to pay to this defendant, in accordance with said contract as so altered, the said agreed market prices for said fruit prevailing during the seasons of 1920 and 1921, and this defendant is excused from further performance of said contract as so altered, by the said breach on the part of said plaintiff of said contract as so altered.

"Said defendant denies that plaintiff was entitled to purchase the 1922 crop of peaches raised on said ranch and or receive delivery of the same or any part thereof under and pursuant or under or pursuant to said agreement of March 1, 1917, or any other agreement between defendant and Producers Fruit Company, a corporation, or any agreement between plaintiff and defendant, or otherwise or at all, and this defendant denies that he was so informed during any part of the year 1922, but in this regard defendant alleges that said plaintiff failed, neglected and refused to pay the agreed prices for the fruit delivered from said ranch to plaintiff during the seasons of 1920 and 1921 in accordance with the agreement as altered on or about the 17th day of October, 1919, as aforesaid."

Further answering the complaint and "by way of counterclaim" the answer alleges:

"That within the four years last past, and under and by virtue of that certain written agreement, a copy of which is annexed to plaintiff's complaint herein and marked 'Exhibit A,' as such written agreement was altered by the agreement between plaintiff and defendant, made on or about the 17th day of October, 1919, which has been executed by defendant and breached by plaintiff as hereinbefore alleged, the said plaintiff became and was indebted to this defendant in the sum of $12,681.50, for goods, wares and merchandise, to-wit: fruit sold and delivered by this defendant to said plaintiff at the special instance and request of said plaintiff and for which said plaintiff agreed

to pay to defendant the prevailing market prices for said fruit during the seasons of 1920 and 1921 as hereinbefore alleged.''

The answer admits that the sum of $8,898.87 has been paid on account of said sum of $12,681.50, but alleges that there is still due, owing and unpaid to defendant, on said sum, the sum of $3,782.63, for which sum the defendant prays that he be awarded judgment.

The cause was tried by a jury, and a verdict returned that ''plaintiff is not entitled to recover anything as against the defendant; and that defendant is entitled to recover of and from plaintiff, upon the defendant's counter-claim, the sum of $2,358.93.''

Plaintiff made a motion for a judgment in its favor, notwithstanding the verdict. The motion was denied, and judgment was entered in favor of defendant in accord with the verdict.

The plaintiff appeals from the judgment and also from the order denying the plaintiff's motion that judgment be entered in its favor, notwithstanding the verdict of the jury.

It is conceived to be the more orderly to set out the facts before stating the legal points upon which plaintiff relies for a reversal of the judgment.

The terms of the written contract entered into between the plaintiff's assignor and the defendant are sufficiently set forth hereinabove.

It appears that, during the years 1919, 1920, and 1921, one J. H. Randolph was the plaintiff's superintendent of its Placer County shipping agencies; that, as such he had charge of the Auburn, Newcastle, Penryn, and Loomis districts for the plaintiff, and the local agents at the places named worked for plaintiff under his supervision; that his duties were ''to solicit fruit and ship fruit''—that is, he was engaged in ''handling fruit and buying fruit'' for plaintiff. ''We sometimes bought fruit and sometimes handled it on commission,'' Randolph testified. Prior to the time he became connected with the plaintiff Randolph, for several years, acted in a similar capacity for plaintiff's assignor, Producers Fruit Company, and continued so to act until the latter went out of business and transferred all its in-

terests to plaintiff. Just when this transfer took place the record is not clear, but it does appear that the contract of March 1, 1917, was made between defendant and the predecessor of the plaintiff.

The undisputed evidence shows that the defendant grew upon his fruit ranch table, or, as it is referred to in the testimony and briefs, "shipping fruit," as well as canning fruit—that is, fruit that is to be shipped in a condition suitable for canning or packing. The written contract of March 1, 1917, covered canning fruit only; hence, the defendant was, so far as said written contract was concerned, perfectly free to sell his table or shipping fruit to or through whomsoever he pleased. In other words, the written contract referred to did not include or cover the table or shipping fruit produced by the defendant during any of the years embraced within the ten-year period during which said contract was to run or subsist.

It appears that, while under no contractual obligation to do so, the defendant delivered the shipping as well as the canning peaches produced or grown on his ranch in the years 1917 and 1918 to the plaintiff's assignor and the plaintiff. In the year 1919, and after plaintiff succeeded to the interests of the Producers Fruit Company, the defendant, in obedience to the terms of the contract of March 1, 1917, delivered his crop of canning peaches to the plaintiff's assignor, but delivered his shipping peaches to the Earl Fruit Company.

In the month of August, 1919 (near the end of the fruit season), Mr. Randolph (above referred to), as representative of the plaintiff, called upon the defendant at the latter's home, and, in effect, proposed to the defendant that the contract of March 1, 1917, be canceled or abandoned, and that in lieu thereof an agreement be made between him and plaintiff whereby defendant would agree to sell and deliver to the plaintiff, during every year of the balance of the unexpired term of ten years provided in said written contract—that is, from and including the year 1920 to and including the year 1926—all his shipping as well as all his canning fruit, the defendant to receive for all said fruit the prevailing market prices at the times of the sale of the fruit, less a commission of seven per cent on the table fruit and a loading

charge of $2.50 per ton on the canning fruit. This proposition was accepted by defendant, the agreement being that the contract thus· made should be substituted for the written contract of March 1, 1917, and that the latter contract should then and there be considered as canceled. Goddard said that on the occasion of the making of the oral agreement nothing was said by either him or Randolph about committing the said agreement to writing. The defendant, however, testified that some time in the year 1920, although he was then delivering all his fruit to plaintiff in pursuance of the oral agreement, he spoke to Randolph about a written memorandum of the terms of said oral agreement, and that Randolph said that he would have a written memorandum ready and presented for execution "as quick as he could," but defendant "to keep right on" and "continue shipping his Clings, shipping fruit and all," or, in other words, to continue delivering all his fruit to plaintiff under the terms of the oral agreement. The defendant did continue to deliver all the fruit grown on his ranch—that is, all the canning and table fruit and so delivered all such fruit for the years 1920 and 1921, under and in pursuance of the terms of the oral agreement. The plaintiff received or accepted the fruit so delivered, sold, or marketed the same, and rendered to defendant a statement of the result of the sale of the fruit delivered by the latter to it in the year 1920 and a like statement for the fruit so delivered in the year 1921. The 1920 statement showed that plaintiff received the following prices per ton for the fruit delivered to it by defendant in the year just named: For No. 1 Phillips, $110; for No. 2 Phillips, $55; for No. 1 Levi, $100, and for No. 2 Levi, $50. The total amount for which said fruit was sold was $9,128.68. Deducted from that sum were the loading charges, and the sum of $7,210.06 paid to defendant by plaintiff on account of said sales. Said statement also contained a charge against defendant of $2,358.93 noted as follows: "Your proportion of expense in re United Cannery action." This would leave the defendant, at the time of the rendition of said statement, indebted to plaintiff in the sum of $560.99, for which sum, in a letter to defendant accompanying said statement, the plaintiff requested the former to execute and return to it his promissory note. The

1921 statement showed that the sales aggregated the sum of $1,832.15, and a net sum in favor of defendant, after deducting commissions and certain charges, of $1,688.21. The record is not clear as to the nature or purpose of the action referred to in the statement of 1920 sales as "the United Cannery action." There is, though, no point made here with regard to that action, or whether the charge made against the defendant on account of that suit was or was not a legitimate charge. The defendant, however, repudiated that item in said statement, claiming that he was in no way connected with or responsible for, or, either directly or indirectly, a party to or in interest in said action, and insisted upon plaintiff paying to him the full amount shown by said statement to be due him, regardless of the charge based upon said action. The plaintiff refused to make a settlement of the statement on the basis suggested and insisted upon by defendant, and the latter, claiming that thus the plaintiff had breached their oral agreement, conceived that he was under no further obligation to deliver any fruit to the plaintiff.

The above statement, as may be supposed, is extracted principally from the testimony of defendant and his wife, the latter having testified that she was present in October, 1919, when, as her husband testified, the oral agreement was made, that the terms of the said agreement were such as they are given above from defendant's testimony, and that she heard Randolph tell the defendant, when the latter asked the former when he would have a written memorandum of the oral agreement ready for the signatures of himself and plaintiff, to proceed with the delivery of all his fruit to plaintiff and that the written memorandum would be prepared and presented as soon as he could have it done.

Randolph gave a different version, in certain particulars, of what took place between him and the defendant and his wife at the time the oral agreement was made. He also claimed, and so testified, that, while it was true that he was a general agent or manager of the plaintiff in Placer County during the years preceding and at the time the alleged oral agreement was made, it was not within the scope of his authority as such general agent or manager to make any agreement with any fruit grower with whom plaintiff

had a contract for the sale of his fruit, to change or modify or rescind such contract, or to make any contract for plaintiff with any other grower; that he could change, modify, rescind, or abandon a subsisting contract for plaintiff only when specially vested with such authority by plaintiff in writing, and that he had no such written authority at the time of the making of the alleged oral agreement with defendant to negotiate either a new contract with defendant or to make an agreement modifying the written contract of March 1, 1917. All the authority. he possessed as agent or manager in Placer County of plaintiff, he said, had been reduced to writing. His written authority, however, had been destroyed by fire, he stated, and, therefore, could not be produced at the trial, but a form of the written contract whereby he was employed as agent or manager was the same in all respects as the form of a like contract whereby another agent or manager for plaintiff was appointed, and that form was introduced in evidence and the limit of his authority as such agent was, with the aid of his testimony, thereby shown. By said document Randolph "promised and agreed," among other things, "not to make or enter into any contract or agreement of any kind or nature whatsoever for the purpose of binding or obliging the said Producers Fruit Co. of California, without first receiving written authority therefor in manner as above specified." The "manner as above specified" is in the preceding paragraph of the document and is to the effect, paraphrased, that, having no such authority, he will not attempt to make any agreement for and on behalf of plaintiff, "except said authority be specified, given and granted by the terms hereof or by instrument in writing, signed by," certain named individuals.

Randolph admitted that, in the year 1919, after the shipping season for that year was over, he called on the defendant and his wife at their home for the purpose of securing a contract for the plaintiff for the handling of all the fruit grown by the latter on their ranch. "A man in the fruit business," testified Randolph in that connection, "wants to get all the business he can. Mr. and Mrs. Goddard had been shipping with the Producers Fruit Company, and when they quit doing business with that company for one year (meaning the year 1919, when they delivered or sold their table or shipping

fruit to the Earl Fruit Co.)—I naturally wanted to get it back." Randolph also admitted that he proposed to defendant that the 1917 written contract would be canceled if the latter would make an agreement to deliver all his fruit to plaintiff on the terms stated by defendant and his wife, as above set forth. He testified, though, that he said to defendant, and defendant agreed thereto, that there must be a written marketing contract covering their oral understanding or agreement, and that he would attend to having one prepared and presented to defendant for his signature. In the month of June, 1920, Randolph testified, he called on the defendant and informed him that the plaintiff was willing to agree to a substitution of a marketing contract, covering all the fruit grown by defendant containing the terms agreed on in the oral agreement, for the 1917 written contract, and that later he would bring or send to him (defendant) a written agreement containing the terms of the oral agreement—that is,. that defendant was to receive for all his fruit the prevailing market prices, minus seven per cent commission on the shipping fruit and $2.50 per ton loading charge on canning fruit; that defendant replied, "All right"; that, in August, 1920, he (Randolph) called on defendant and informed him that "the company" (plaintiff) would make the marketing contract, "but they felt they should have the new contract take the place of the Cling contract (referring to the contract of March 1st, 1917) for a period of ten years and the charge of $5.00 a ton as the loading charge." Defendant, Randolph said, refused to sign any contract which would bind him to a contract with plaintiff for all his fruit for a period of ten years from the date of the execution of the proposed new contract, and further declared that he would not agree to a loading charge of $5 per ton. He also told Randolph that his (defendant's) wife, who was not present at that conversation, would not sign an agreement containing the terms mentioned. Randolph said that when the conversation was being held he had the written agreement in his pocket, but that, defendant having declared that he would not sign it, because of the ten-year term and the increased loading charge therein provided for, he did not take the writing from his pocket or show it to defendant. The defendant, so Ran-

dolph admitted, made it clear to him (Randolph) on the occasion referred to that he would execute a written agreement in accord with the oral agreement, viz.: For a term of six years, covering the unexpired period or term of ten years for which the written contract of March, 1917, provided, and providing that plaintiff should receive and sell all his fruit every year for the six years, on a commission of seven per cent on the packing fruit and $2.50 per ton loading charge. Further testifying, Randolph said: That, subsequent to the conversation just related, he received word from the Sacramento office of the plaintiff, advising him not to execute the proposed new agreement until after the "cannery action" was settled, as the lawyers of the plaintiff were apprehensive that the making of such new contract or one to be substituted for the contract of March, 1917, might in some manner affect the suit; that the "canning suit" was settled in April, 1921, and that at the close of the fruit season of that year, and subsequent to the date of the same, he attempted to induce defendant to sign a marketing contract covering all his fruit for a period of six years, but insisted on keeping in the contract a provision for a $5 per ton loading charge. Said proposed written agreement was dated the tenth day of August, 1921, and signed by plaintiff. Both defendant and his wife refused to sign the agreement as so proposed. The defendant had then delivered all his fruit for the years 1920 and 1921 to the plaintiff under and in pursuance of the terms of the oral agreement of 1919, as above indicated.

Randolph repeatedly stated that the new agreement was intended to be a substitute for the written contract of March 1, 1917. Indeed, such was the trend of all the conversations between him and defendant relative to the oral agreement. Randolph was asked by the attorney for defendant whether the latter, on the conclusion of the conversation relative to the oral agreement, in June, 1920, said that "he would commence shipping his fruit to the Producers Company," to which he (Randolph) replied: "Yes, the visit before he said that—he did commence delivering it."

In rebuttal defendant denied that Randolph at the former's ranch, in the month of August, 1920, or at any time or any place, told him (defendant) that the plaintiff

wanted a ten-year marketing contract on his fruit and an agreement that ''I would pay a loading charge of $5 per ton.'' Defendant further contradicted Randolph's testimony that he (defendant) told him (Randolph) at any time or place that Mrs. Goddard, wife of defendant, ''would not sign any such contract,'' referring to the proposed written memorandum of the oral agreement, containing, however, contrary to said agreement, as the Goddards claimed, a provision that said agreement should cover or embrace a term or period of ten years from the date of the execution thereof and that defendant would pay plaintiff $5 per ton as a loading charge.

The above comprehends a statement in substance of the salient facts of the controversy.

The plaintiff contends: 1. That Randolph, the general agent of plaintiff, was without authority to negotiate the alleged oral agreement; 2. That, even if, at the time said agreement was made, he possessed such authority, the agreement was, nevertheless, invalid, under the terms of subdivision 1 of section 1624 of the Civil Code, which provides, *inter alia,* that an agreement that by its terms is not to be performed within a year from the making thereof, is invalid, unless the same, or some note or memorandum thereof, is in writing and subscribed by the party to be charged; that furthermore, the said agreement being oral and executory and its purpose to alter a contract in writing, it was invalid under section 1698 of said code, which provides: ''A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise''; 3. ''That the evidence without conflict shows that the oral agreement was expressly understood and contemplated to be placed in writing and signed by each of the parties,'' and that until the same was put in writing no contract existed, ''and neither party was bound by the same, irrespective of whether one or both of the parties had performed the same pursuant to the terms thereof, and in reliance that it would be placed in writing and signed by each of them''; 4. That the jury disregarded the instructions of the court.

[1] It is to be assumed that the verdict implies the finding by the jury of the following facts: 1. That Randolph at least possessed ostensible authority to negotiate the oral

agreement above referred to and described; 2. That the defendant Randolph in October, 1919, entered into the said oral agreement and that defendant, in pursuance of the terms of said agreement, delivered to plaintiff all the canning and shipping fruit grown on his ranch in the years 1920 and 1921; 3. That plaintiff received, accepted, and disposed of all said fruit upon the terms agreed upon in said oral agreement; 4. That nothing was ever said about committing the terms of the oral negotiations to writing until after defendant had proceeded with the delivery of all his fruit to plaintiff and the acceptance of the same by plaintiff; 5. That no written memorandum of the oral agreement was ever submitted by Randolph or any other person acting for plaintiff to the defendant, to be signed by the latter; 6. That defendant, at some time subsequent to the making of the oral agreement and before he had delivered all of the fruit grown on his ranch in the two years named—1920 and 1921 —to plaintiff, asked Randolph if he had a written memorandum prepared, to which Randolph replied in the negative, but told the defendant to proceed with the delivery of his fruit as stipulated in said agreement and that ''everything would be all right,'' or words to that effect, and that, as above stated, defendant did so.

The facts above set forth were, as stated, comprehended within the implied findings of the jury. In the evidence as to some of those facts there is no conflict. As to some there is a conflict. Upon the question whether, at the time of the oral negotiations, it was understood between Randolph and defendant that, before those negotiations should take the form of an agreement, the terms thereof should be reduced to writing, there is a conflict. The defendant testified, as we have seen, that the terms of the new contract were agreed to by both him and Randolph at the time the new agreement was first proposed, that nothing was then said about committing them to writing, and that he proceeded, at the seasonal time for fruit shipping, to carry out the agreement; that, conceiving it to be the better plan to have the terms put in writing, he spoke to Randolph about a written memorandum after he had delivered and plaintiff had accepted his shipping and canning fruit under the oral agreement. Randolph, as seen, testified that the under-

standing was, when the oral negotiations for a different contract from that then existing were had, that the terms to which they then agreed should be committed to writing. Hence, it is clear that the evidence is such that it cannot be said, as a matter of law, that the jury were not warranted in finding the vital facts—those above enumerated—favorably to defendant.

[2] 1. It is clear that the evidence discloses circumstances from which the defendant had the right to infer and the jury to find that Randolph was vested with authority by plaintiff to negotiate and consummate the oral agreement. Randolph, for some time prior to the transfer of the interests and business of the plaintiff's assignor to plaintiff, represented the former in Placer County in precisely the same capacity in which he was acting for the plaintiff at the time of the making of the oral agreement, namely, general superintendent or manager of the plaintiff's business in handling and purchasing fruit, and the evidence shows that he entered into the employment of the plaintiff in the capacity mentioned, operating as such in Placer County, immediately upon the plaintiff succeeding to the fruit business of its assignor, the Fruit Producers Corporation. Randolph admitted that, acting for plaintiff's assignor, he personally conducted the negotiations leading to the making of the written agreement of March 1, 1917. In his capacity of superintendent or manager for plaintiff and its predecessor he had exercised control or supervision of all the local fruit agencies of those corporations for several years prior to the time at which the oral agreement was made, and in that capacity, as well may be inferred from the evidence, made contracts with other fruit growers in the vicinity of the defendant's home. In addition to the foregoing considerations it was not shown that the defendant ever knew that Randolph was in any way limited in his authority by the plaintiff or its predecessor in the matter of making fruit contracts with fruit growers in Placer County. We think that these facts and circumstances were sufficient to establish in the mind of the defendant and in warranting the jury in so finding that the plaintiff held Randolph out as its agent in Placer County, with  plenary power as such, to make for it contracts for the handling of fruit grown in said county. In

other words, we think it is clear that the evidence warrants the conclusion that Randolph possessed ostensible authority to act for the plaintiff in said county in the particulars referred to, and even if we were required to say that the circumstances were not such as to show that the plaintiff intentionally caused third persons in said county to believe him to be possessed of such power as such agent that such third persons were allowed to so believe by the want of ordinary care on the part of the plaintiff. (Sec. 2317, Civ. Code.) The case here comes squarely within the rule stated in *Robinson* v. *American Fish etc. Co.*, 17 Cal. App. 212, 219 [119 Pac. 388, 390], as follows: "The law will not, of course, permit a principal to escape the liability which it attaches to him by reason of such circumstances as are present here, upon the plea that the agent has violated or transcended some limitation that he has secretly or without the knowledge of those with whom his agent, as such, is to deal placed upon the latter's authority as such agent. . . . As is said by all the law-writers, and all the cases, the rule is that 'quiescence is tantamount to acquiescence,' and forbids the principal denying an authority which his own conduct has invited those with whom he was dealing to assume. (See Clark on Contracts, p. 717, and cases cited in the footnote.) So, it may be true—indeed, assumed—that appellant did limit the authority of Junta in the respects specified by the latter, and yet the former, under the circumstances as disclosed here, and according to the implied findings of the jury, is still bound by his acts and estopped by its own conduct from denying his authority to go as far as he did. 'Where the special character of the agency is not known, and the principal has clothed the agent with apparent powers, strangers, in dealing with the agent, may assume that such apparent powers are possessed. The principal cannot, by private communication with his agent, limit the authority which he allows the agent to assume.' (Clark on Contracts, p. 734, and cases cited.)" (See *Leavens* v. *Pinkham & McKevitt*, 164 Cal. 242, 244 [128 Pac. 399], in which the facts are strikingly similar to those herein, and, also, *Jan Wai* v. *Smith-Riddle Co.*, 55 Cal. App. 59 [202 Pac. 952]; 1 Cal. Jur., sec. 44, p. 745.)

[3] But the question of the authority of Randolph to make and bind the plaintiff by the oral agreement is without material significance, since the evidence unquestionably shows that there was at least an implied ratification of the oral agreement by the plaintiff in that it accepted and disposed of all the fruit grown on defendant's ranch and delivered by the latter to the former in the years 1920 and 1921, in accord with the terms of said agreement. Indeed, to the extent of that portion of the period during which the agreement was to exist covered by the years 1920 and 1921, the agreement was fully performed and executed. The written statements rendered by plaintiff to defendant showing the sales according to the prevailing market prices of the years 1920 and 1921, the verity of which was in no way challenged or impeached, together with the fact that plaintiff accepted and handled all the fruit produced by defendant on his ranch for those years, stand as conclusive evidence of the fact that plaintiff, in accepting and handling said fruit, was acting and did act in pursuance of the terms of said contract, and thus ratified it.

That the oral agreement constituted an entirely new contract and the jury were justified in finding that it was made with the intention that it should be substituted for and so extinguish the contract of March 1, 1917, are propositions which seem to afford no ground for legitimate discussion. The agreement is itself evidence evincive of an intention by both parties that it should constitute a novation, or as our law defines such a transaction, the substitution of a new obligation for an existing one. (Civ. Code, sec. 1531.) It is widely divergent or different in terms from the contract of March 1, 1917. By the latter, as has been pointed out, and as is obvious, the defendant was bound to the delivery of his canning fruit only at definitely specified prices. As before stated, he was under no obligation under said contract to deliver or sell any of his shipping or table fruit to the plaintiff or its assignor. These he could dispose of as he saw fit or as pleased him. Under the new agreement he obligated himself to deliver to plaintiff both his canning and shipping fruit, not at specified prices, but at the prevailing market prices at the times the sales of the fruit were made.

2. We are wholly out of accord with the contention that the new agreement could not have the effect of extinguishing the contract of March 1, 1917, for the reason that, not being in writing, it is invalid under the statute of frauds. (Civ. Code, sec. 1624, subd. 1, *supra.*) [4] It is thoroughly settled that an agreement or contract within the provisions of the statute of frauds, if otherwise valid, is not, merely because it is not in writing, invalid in the sense that it is void. (*Balfour & Garrette* v. *Worley,* 14 Cal. App. 261 [111 Pac. 615]; *Durbin* v. *Hillman,* 50 Cal. App. 377 [195 Pac. 274]; *Kinney* v. *Jos. Herspring & Co.,* 53 Cal. App. 628, 636 [200 Pac. 737]; *Warder* v. *Hutchison,* 68 Cal. App. 291 [231 Pac. 563]; *O'Brien* v. *O'Brien,* 197 Cal. 577 [241 Pac. 861].) It follows that an agreement not in writing but which the statute requires shall be in writing to be enforceable, if legally unobjectionable in all other respects, is as effective as to all the purposes for which it has been made as is such an agreement whose terms have been committed to writing until its enforcement is voided upon the ground that it is not in writing. [5] This proposition is sustained by the consideration that, because the statute of frauds relates to the remedy only, a defense based thereon may be waived. (12 Cal. Jur., sec. 110, p. 941, and cases therein named.) Hence, upon the making of the oral agreement, the written contract of March 1, 1917, *ipso facto et eo instanti,* passed out of existence and became *functus officio.* And this proposition would still remain unimpeachable even where the statute of frauds had been successfully interposed against the enforcement of the terms of the new agreement itself. [6] The question whether a novation has taken place is always one of intention (Civ. Code, sec. 1531; *Parkside Realty Co.* v. *McDonald,* 166 Cal. 426, 430 [137 Pac. 21]; 29 Cyc. 1134), and where it satisfactorily appears that a new agreement was intended by the parties to take the place of an existing one, as clearly it was so made to appear here, since the parties proceeded to be and were for two years governed by the substituted agreement, then, as stated, it necessarily follows that the old agreement has been entirely abrogated or extinguished. As is said in *Beckwith* v. *Sheldon,* 165 Cal. 319, 323, 324 [131 Pac. 1049, 1050]:

"This extinguishment does not mean that the earlier contract was held in abeyance or in suspense. It does not mean that it could be revived upon a mere failure to perform the new obligation. It means that it was canceled and obliterated as completely as though it had never had existence. It means that, saving in the exceptional cases which are indicated by section 1533 of the code, and of which this is not one, all rights are to be measured and determined under the new substituted obligation as completely as though it had never been preceded by an earlier contract. It matters not, as has been said, that the new agreement is itself executory. Indeed, generally speaking, all the cases arise when the substituted agreement is executory, for, if executed, there could seldom or never be cause of complaint or ground of action. The courts have felt themselves compelled to look no further than to determine whether a novation has taken place, or in other words, whether the new contract was entered into without fraud and with an agreement of minds that it was to be substituted for the existing obligation. When that point has been reached they have found no difficulty in declaring that the rights of parties to the agreement are to be governed by the new contract alone, and that a failure to perform does not, under any theory of rescission or revivor, operate to breathe new life into the dead and extinguished obligation. (*Spier* v. *Hyde,* 78 App. Div. 151, [79 N. Y. Supp. 702] ; *Morehouse* v. *Second Nat. Bank,* 98 N. Y. 503; *Kromer* v. *Heim,* 75 N. Y. 576, [31 Am. Rep. 491] ; *Dean* v. *Skiff,* 128 Mass. 174; *Huggins* v. *Safford,* 67 Mo. App. 469; *Howard* v. *Scott,* 98 Mo. App. 509, [72 S. W. 709] ; *Oakley* v. *Ballard,* 1 Hempst. 475, 18 Fed. Cas. 515.)"

[7] The theory upon which we feel justified by the record in deciding this case makes inapplicable, regardless of the consideration that the oral agreement was in part executed, those cases in which it is held, in accord with section 1698 of the Civil Code, that a contract in writing may only be altered by a contract in writing or an executed oral agreement. As has already been shown, the oral agreement here goes further than merely to modify or alter the existing agreement—its effect was to work a novation and the consequent rescission or abrogation of the written contract of March 1, 1917. Manifestly, no one

will take the position that the abandonment or extinguishment of a written contract by the mutual agreement of the parties may not be shown by parol. The rule that such extinguishment may be so shown proceeds from the very nature of such a transaction itself and has often been applied by the courts. (See *Pearsall* v. *Henry*, 153 Cal. 314 [95 Pac. 154, 159]; *Credit Clearance Bureau* v. *Hochbann Cont. Co.*, 25 Cal. App. 546 [144 Pac. 315]; *Proud* v. *Strain*, 11 Cal. App. 74 [103 Pac. 949].) In those cases it is held that where an oral agreement is substituted for an existing written agreement, section 1698 of the Civil Code has no application.

[8] 3. To the contention that the oral agreement was without binding force for the reason that it was agreed, in the making thereof, that it should not bind the parties until its terms were reduced to writing, a sufficient answer is that, upon the question whether such an understanding was had when said agreement was made the evidence is in sharp conflict, from which situation it follows, in view of the direct and explicit instructions given by the trial court to the jury upon that question, that the verdict must be interpreted to imply a finding that it was not understood or agreed by and between Randolph and defendant, at the time said agreement was made, or at any other time, that the terms thereof should be committed to writing and signed or subscribed by the parties before it should become operative or binding upon them. The fact that both parties, after the oral agreement was made, acted upon or in conformity with the terms of the oral agreement for two consecutive years immediately succeeding the date of the making of said agreement is itself singularly persuasive as in substantiation of defendant's testimony and that of his wife that no such an agreement was made or understanding had. It is a consideration worthy of note that, if it were true that the agreement was to be put in writing, the written statement delivered to defendant by plaintiff and signed by the latter of the sales of the fruit in 1920 in accord with the terms of said agreement, in effect, constituted at least an acknowledgment in writing of the making of said agreement.

[9] But it is vigorously asserted by counsel for plaintiff that the case went to issue entirely upon the theory that the

oral agreement involved an attempted modification of the written agreement of March 1, 1917, and that the trial was had and submitted to the jury solely upon that theory; that, accordingly, the case should be here decided on that theory. Practically, the case was tried upon both theories— that is to say, upon both the theory that the oral agreement involved a modification of the existing agreement and upon the theory that it wrought a novation. The defendant in his answer pleaded or set forth the terms of the oral agreement and it is in the case to speak for itself. It is true that defendant, in pleading said agreement, characterized it as a modification of the written contract so often referred to herein; but the courts are not bound by the construction the pleader may give to a written instrument or an oral contract declared upon or set up as a defense, or the pleader's conception of the legal nature or effect thereof. As pleaded, the oral agreement upon its face is clearly a new agreement between the same parties relative to the same subject. And there was evidence that as pleaded it was made and intended to take the place of the one then in existence. Randolph and the defendant and the latter's wife repeatedly declared, when giving their testimony, that it was expressly agreed and clearly understood that the oral agreement was to operate as a substitute for the old agreement, or, as Randolph himself several times expressed it, "as in exchange for the written agreement." While these statements by those witnesses do not constitute the criterion determinative of the legal nature of the oral agreement (a function of the court), still they show and emphasize what the parties themselves understood and, in fact, intended was to be the purpose of said agreement when they were negotiating the consummation thereof. But a further and quite a significant consideration in the present connection is that, while it is true that the trial court submitted to the jury a number of instructions fitting the theory that the oral agreement involved a modification of the written contract of March 1, 1917, it also gave to the jury the following: "If, from the preponderance of the evidence in this case, you find that plaintiff and defendant entered into an agreement *as a substitute* for the written contract sued upon, which agreement was to be placed in writing and signed,

but which has not been either reduced to writing or signed by plaintiff and defendant," then the plaintiff is entitled to a verdict, etc. While, perhaps, it may not be strictly correct to say that the question whether the oral agreement was intended as a substitute for the original agreement was thus directly submitted, yet the phraseology of the instruction is such that, when considered with the evidence in the case as to the circumstances characterizing the making of said agreement, it may justly be concluded that the theory that said agreement was intended to operate as a novation or to be substituted for the contract of March 1, 1917, was fairly within the case, as it was tried and submitted to the jury. Indeed, the facts of the transaction culminating in the making of the oral agreement would necessarily be the same, whatever might be the legal nature of said agreement. As Mr. Justice Waste said, in *McClure v. Alberti*, 190 Cal. 348, 350 [212 Pac. 204, 205], which involved an action upon a contract similar in its general aspects to the one here, and in which it was objected that the trial court committed prejudicial error by allowing the respondent to amend her pleadings, after the evidence was all in, so as to make them conform to the proof that the contract declared upon wrought a novation rather than the alteration of an existing agreement, as was the theory of plaintiff's case as originally framed and filed, so in principle it is true here:

"Assuming that an additional issue was tendered by the amendment, we cannot see how the testimony in the case could have been different from that already introduced. All the facts were before the court, and its findings (verdict here) conclusively establish the liability of the appellants, irrespective of whether the issue was one of an alteration of the written contract or its entire abandonment and the substitution of the oral agreement."

[10] 4. The given instructions which appellant contends the jury disregarded in considering the evidence and arriving at a verdict were framed upon the theory that the oral agreement constituted and effected a mere alteration of the original contract. They were given to the jury at the request of the plaintiff, but, as the verdict accords with what we conceive to be the correct theory of the nature of the oral agreement, and is evidently well supported upon

that theory, it cannot, of course, consistently be said that a miscarriage of justice has resulted from the failure or refusal by the jury to follow said instructions.

[11] Lastly, it is to be observed that the appellant cannot justly complain that in supporting this appeal it has been placed at a disadvantage because of the theory upon which the case is here decided, since the respondent in his brief, while not elaborating the proposition, nevertheless presented the question whether the oral agreement amounted to a novation, and counsel for the appellant, in their reply brief, noticed that fact, but refused to discuss the question, claiming that that proposition was not an issue in the case. Certainly, the plaintiff cannot justly claim that the question was not opened up by respondent for discussion on this appeal.

The judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 22, 1926, and the following opinion then rendered thereon:

THE COURT.—Counsel for plaintiff, in their petition for a rehearing, state that the former opinion was incorrect in the statement therein that there was a conflict in the evidence upon the question whether it was agreed and understood that the terms of the "new agreement," as it may the more conveniently be designated, were to be reduced to writing before it should become binding upon the parties. On page 32 of the transcript is the defendant's testimony that in October, 1919, Randolph, at defendant's house made a proposition to defendant that plaintiff would cancel the old agreement if defendant would agree to deliver all his peaches for the remainder of the term specified in the old agreement to plaintiff upon the terms stated in the former opinion herein, and that defendant then and there agreed thereto. On page 36 of the transcript it will be seen that defendant testified that on the occasion above referred to nothing whatever was said by either Randolph or himself about committing the new agreement to writing. On cross-examination, defendant repeatedly stated that,

while the new agreement was understood to be a "marketing contract," he also said (Trans., p. 69), that in the conversation in October, 1919, leading to the making of the new agreement, nothing was said about a "written contract." On the same page it will be seen that he also said "there was nothing spoken of a marketing contract"; that all that was said by Randolph was that "he would give us a market price for it" (the fruit). The deposition of defendant as to the transactions involved here was taken prior to the trial. Counsel for defendant based a part of their cross-examination of defendant on said deposition, thereby · showing that defendant therein stated that the understanding was that the new agreement was to be put in writing as a marketing contract. In brief, the defendant's testimony upon that subject seems to be inconsistent. A careful analysis of it would well warrant the conclusion that he was unable to make himself clear regarding that matter. His testimony in places would indicate that what he understood to be a "marketing contract" was an agreement whereby he was to receive the market prices for his fruit, and that it was in that sense that he stated in his testimony that he was to have a marketing contract for his fruit. Again, he would seem to understand the technical characteristics of a marketing contract and stated that no such contract was mentioned when the new agreement was first suggested by Randolph. And repeatedly he said that nothing was ever said about a writing until 1920, about or after the time he delivered all his fruit to plaintiff according to the terms of the "new agreement"; and, again, he stated that he supposed that the terms would be put in writing, and for that reason asked Randolph when he would have the writing embodying the terms of the new agreement prepared. Goddard did say, on cross-examination, that his statement in his deposition that there was an understanding at the time the new agreement was made that said agreement was to be put in writing was correct. In fact, he "backed and filled," so to speak, throughout his testimony, brought out both on his direct and cross-examination, upon the question whether anything was said at the time the agreement was made about reducing said agreement to writing. The testimony of defendant's wife, who was present at the time the new agreement was made,

was something of the same general character as that of her husband regarding this matter. She first stated (direct examination, page 110, Transcript) that nothing was said about a written memorandum of the terms of the new agreement when the same was made. She stated that Randolph and her husband agreed on the terms of the new agreement, as they are explained in the former opinion, and that, in pursuance thereof, her husband in 1920 and 1921 delivered all his fruit to plaintiff under said agreement. On cross-examination she contradicted her testimony to the effect that nothing was said about putting the new agreement in writing at the time said agreement was made. But, with all these inconsistencies considered, we still adhere to the view that the repeated statement of defendant during the course of his examination - that there was no understanding, at the time it was made, that the new agreement should be reduced to writing, and that of his wife to the same effect, taken together with the undisputed fact that defendant delivered to and the plaintiff received and disposed of all of the former's fruit in the years 1920 and 1921 in accord with the terms of the oral agreement, and Randolph's positive testimony that the oral agreement was to be put in writing and that such was the understanding at the time it was made, created a conflict in the evidence upon that question. The jury could, in our opinion, have well concluded, upon a consideration of the testimony of both Goddard and his wife as to the matter in hand, that, having freely admitted that there was some talk subsequent to the making of the oral agreement about putting the same in writing, became confused as to dates, and that what they at all times intended to say was that no writing was spoken of until some time after the oral agreement was made and the parties had proceeded to carry out the terms of said agreement. **[12]** At all events, the apparent inconsistencies in their testimony concerned particularly the question of their credibility, or the weight of their testimony, which it was for the jury to settle, as, upon the whole case, it was for the jury to determine whether there was or was not any understanding had between Randolph and Goddard, that, before the terms of the oral agreement were to become binding upon the parties, the same should be put in the form of a writing.

But, be all that as it may, we are in no doubt that, even if the oral agreement was void for the reason that it was not put in writing as agreed, if such was the agreement, the fact that both Randolph and Goddard agreed, at the time the oral agreement was first discussed, that it should be substituted for the old written contract, and the further fact that in the years 1920 and 1921 the defendant delivered all his fruit to the plaintiff and the latter received, handled and disposed of the same precisely according to the terms of the oral agreement, as shown by its statements rendered to defendant for those years, constitute conclusive evidence of an intention on the part of both parties to abandon and so cancel the written agreement of March 1, 1917 (*Parkside Realty Co.* v. *McDonald*, 166 Cal. 426, 430 [137 Pac. 21]; 29 Cyc. 1134; Civ. Code, sec. 1531), and that such was the effect thereof. There is no inconsistency between the conclusion thus announced and the fact, if it is a fact, that the so-called new agreement was or is void or nonenforceable because not committed to writing. [13] The fact that a written contract has been abandoned or canceled may be shown by parol, and, while it is true that the terms of the oral agreement, in so far as they are executory, may not be enforced, if it be true that the agreement was that they should be committed to writing before they were to become binding, still the fact that the parties themselves acted upon and in accord with the terms of the oral agreement, it having been expressly understood that said agreement was to supersede or be substituted for the old or existing agreement, is competent proof of the intention to abandon and cancel and consequently of the fact of the abandonment and cancellation of the latter agreement.

The cases cited by counsel in their petition as upholding their position that the old agreement, upon which this action is grounded, still exists or was never abandoned or canceled have no application to the situation here. They are: *Spinney* v. *Downing*, 108 Cal. 666 [41 Pac. 797]; *Aftergut* v. *Mulvihill*, 25 Cal. App. 784 [145 Pac. 728]; *Mercantile Trust Co.* v. *Sunset etc. Co.*, 176 Cal. 461 [168 Pac. 1037]; *Durst* v. *Jolly*, 35 Cal. App. 184 [169 Pac. 449]; *Dillingham* v. *Dahlgren*, 52 Cal. App. 322 [198 Pac. 832]. In each of the cases named the action was on the

invalid contract, or, in other words, involved an attempt to enforce a contract which was void because it offended the statute of frauds or was not committed to writing, as the parties agreed that it should be before its terms should be binding upon them.

[14] It will not be disputed (assuming that the oral agreement was invalid) that the defendant was entitled to maintain an action upon a *quantum meruit* for the reasonable value of the fruit which he delivered to plaintiff under the oral agreement and that the prices received by plaintiff for said fruit in 1920 and 1921, minus the commissions and loading charges, as disclosed by the statements of the sales rendered to defendant by plaintiff, constituted sufficient evidence of the reasonable value of said fruit to support a finding that the prices so received represented its reasonable value.

The petition for a rehearing is denied.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 18, 1926.