[S. F. No. 16229. In Bank.—December 28, 1939.]

ELIZABETH SILVA, Respondent, v. PROVIDENCE HOS-
PITAL OF OAKLAND (a Corporation), Appellant.

Weinmann, Quayle & Berry and Herbert Chamberlin for
Appellant.

Gibson, Dunn & Crutcher, Norman S. Sterry and Philip C. Sterry, as *Amici Curiae,* on Behalf of Appellant.

H. Raymond Hall and Edward J. Silver for Respondent.

EDMONDS, J.—By this appeal, Providence Hospital of Oakland seeks to avoid liability for damages awarded to the plaintiff because of personal injuries suffered by her while under its care, upon the ground that it is a charitable institution.

The facts in the case are practically undisputed. Almost four years ago, while the plaintiff was a patient in the hospital and paying the amounts charged by it for the services rendered to her, she fell and fractured her hip by reason of the negligence of the hospital nurse in failing to equip her bed with a side board. The hospital concedes the sufficiency of the evidence to support the findings on the issues of negligence, but it challenges the findings and conclusions of law upon a special defense of exemption from liability.

In its answer, the hospital alleged that since 1903, when it was incorporated under the laws of this state, it has been, and now is, a nonprofit corporation; that its object and purpose is to erect and maintain one or more hospitals to provide medical and surgical care for sick and disabled persons; that it has no capital stock; that its members and officers derive no pecuniary profit from the operation of the hospital and serve without pay; that poor and needy persons are admitted to the hospital without distinction of class or creed; and that charity patients are afforded the same treatment as patients who pay for services rendered.

Evidence offered in support of this defense established the facts alleged. The appellant also proved that the hospital is one of those owned by the Sisters of Charity of Montreal, Quebec, and is operated and controlled by members of that order. After acquiring land it erected a hospital building with money borrowed from the Roman Catholic Archbishop of San Francisco. Thereafter, solely from the profits of the hospital, it paid off this indebtedness, acquired a new site and commenced the erection of a second hospital. At this time, it had $60,000 in cash in addition to the two properties.

In 1926, when the new building was completed, the assets of the corporation were considered by it to be worth $1,675,-

000. At the time of the trial it still had those assets subject to an indebtedness of $949,000. In 1936, the year of Mrs. Silva's injury, its income from patients was sufficient to meet all of its operating expenses, taxes, and interest, and to pay $11,000 on its indebtedness. From the testimony of the treasurer it appears that six per cent of the patients are cared for as a matter of charity, thirty per cent pay the charges of the hospital in part, and the balance, sixty-four per cent, pay their bills in full. It also maintains a clinic on a "straight charity basis".

When Elizabeth Silva, then a woman over seventy years of age, required hospital care, her daughter decided to take her to the respondent's institution. No special rates for pharmaceutical supplies, X-rays, or surgery were mentioned. So far as she was informed, the hospital did not agree to furnish any care or treatment "at less than the regular profitable rate".

The appellant contends that it is a charitable organization, and that as there is no claim that it did not use due care in the selection and retention of its employees, it is exempt from liability for tort. This contention presents squarely for decision the question whether a charitable corporation is liable for harm tortiously inflicted by an employee acting within the scope of his employment.

In many states, corporations organized for charitable purposes and operating as such enjoy immunity with respect to liability for wrongs occurring through the negligence of their servants and employees, if those employees have been selected and retained in the exercise of due care. However, there is much inconsistency and confusion among the decisions which follow this rule, due in large measure to the fact that the courts do not all base it upon the same theory. Possibly the one most generally stated is the so-called trust fund doctrine, first announced by an English court in 1848. (*Heriot's Hospital* v. *Ross*, 12 Clark & F. 507; 8 Eng. Reprint 1508.) According to this view the patron deals with the charity upon the condition that the trust assets are not available to him for the payment of damages. Another theory upon which the rule of nonliability has been based is that by implied contract one who accepts the services or care of a corporation organized and operating for charitable purposes waives his right to hold it liable for tort. Other courts have held that

such an organization should not be held liable for tort upon the ground of public policy.

The defense here relied upon was raised as early as 1914 in the case of *Thomas* v. *German Gen. etc. Soc.*, 168 Cal. 183 [141 Pac. 1186], which arose when an employee of a hospital was injured by falling into an elevator shaft. A judgment for the plaintiff was reversed upon the ground that the injury was caused by the negligence of a fellow servant, which at that time was a bar to recovery in such an action. However, the court mentioned a contention of the hospital that the action would not lie against it because of the rule exempting charitable institutions from liability for torts. In agreeing with that contention it said "that where one accepts the benefit of a public or of a private charity he exempts by implied contract the benefactor from liability for the negligence of the servants in administering the charity, if the benefactor has used due care in the selection of those servants." (P. 188.)

This statement was characterized as *dictum* in the later case of *Stewart* v. *California Medical etc. Assn.*, 178 Cal. 418 [176 Pac. 46], decided four years later, where it was pointed out that the Thomas case was decided upon the ground that the defendant was not liable under the rules governing ordinary business corporations. However, although the court discussed the doctrine which exempts a charitable corporation from liability, it affirmed the judgment in favor of Stewart upon the ground that the evidence showed that the institution was in fact operated for profit. Therefore, all that is stated in the opinion in this second case concerning the various theories of nonliability is also *dicta*.

On the other hand, in a number of cases the District Courts of Appeal have held that a corporation operating a hospital for charitable purposes is not liable under the doctrine of *respondeat superior* if it exercises ordinary care in the selection of its servants. Apparently, the question was first raised by the case of *Burdell* v. *St. Luke's Hospital*, 37 Cal. App. 310 [173 Pac. 1008], in which this court denied a hearing the day before it decided the Stewart case. A husband and wife sued for damages on account of injuries suffered while the wife was a patient in the hospital, paying the regular rates for the services rendered to her. Upon a showing similar to that made by the Providence Hospital, the court upheld

the action of the superior court in directing a verdict for the defendant, quoting from the Thomas case as authority for the proposition that one who accepts the benefits of a hospital operated for charitable purposes "exempts by implied contract the benefactor from liability". The fact that the plaintiff was a paying patient did not change the rule of nonliability, said the court, because she was to some extent the beneficiary of the charity dispensed by the hospital.

Although indirectly presented, the question was also considered and passed upon in *Levy* v. *Superior Court*, 74 Cal. App. 171 [239 Pac. 1100]. An officer of a hospital which had been sued for damages by a former patron was adjudged guilty of contempt for refusing to answer questions asked him when his deposition was taken. On a review of the contempt proceeding, it was contended that the rule of exempting a charitable organization for the negligent acts of its employees had not been adopted in this state, and as the hospital carried insurance indemnifying it against such liability, the reason for the rule failed. In answer to this contention, the court pointed out that charitable organizations have been relieved from liability upon the principle that a trustee may not deplete the trust fund set aside for charity by using it to pay damages caused by the tortious acts of those charged with the administration of the trust, and held that the protection afforded by this rule could not be infringed upon by the acts of a trustee in procuring insurance. As the court also held that no action could be maintained upon the policy which had been issued to the hospital until the plaintiff recovered a judgment against the insured, it may be said that the case was decided upon that point, which was controlling. However, the decision recognizes, even if it does not apply, the rule exempting charitable organizations from liability upon the trust fund doctrine.

In *Stonaker* v. *Big Sisters Hospital*, 116 Cal. App. 375 [2 Pac. (2d) 520], a judgment based upon a verdict directed in favor of the defendant hospital was affirmed on the authority of the Burdell case. Later, a hospital, in unsuccessfully urging that an order granting defendants' motion for a nonsuit in a suit brought against it be affirmed, contended that it was a charitable institution, but the court said that "this is an affirmative defense, the burden to prove which rests

with the defendant''. (*Inderbitzen* v. *Lane Hospital*, 124 Cal. App. 462, 466 [12 Pac. (2d) 744, 13 Pac. (2d) 905].)

Judgments against the Palo Alto Hospital were affirmed in *Baker* v. *Board of Trustees, etc.*, 133 Cal. App. 243 [23 Pac. (2d) 1071], upon the ground that it ''was not formed and maintained for charitable purposes''. Some time later the Long Beach Community Hospital was absolved from liability. Citing the Thomas, Burdell and Stonaker cases, the court held that ''the character of respondent association as a charitable institution being established, the trial court properly directed a verdict in its favor if it exercised due care in the selection if its servants, . . . '' (*Ritchie* v. *Long Beach Community Hospital Assn.*, 139 Cal. App. 688 [34 Pac. (2d) 771].)

The next case, *Shane* v. *Hospital of the Good Samaritan*, 2 Cal. App. (2d) 334 [37 Pac. (2d) 1066], is of particular interest because it was brought by a minor to recover damages for injuries alleged to have been sustained on the day of her birth through the negligence of a nurse. On the child's behalf it was urged that although the doctrine exempting charitable institutions from liability for injuries suffered by a patron through the negligence of an employee had been recognized in this state upon the theory of an implied contract, because of the plaintiff's minority the rule could not bar a recovery by her. In answer to this contention the court pointed out that charitable institutions have been held not liable for tort upon four different theories. These, it said, are, first, that of implied contract; second, that funds provided for the maintenance of a charity are contributed for a specific purpose which does not include the payment of claims for damages suffered through negligence; third, the relation of the employee to the patient does not bring the case within the rule of *respondeat superior;* and, fourth, that it is contrary to public policy to allow funds contributed for the maintenance of a charitable institution to be used for the payment of damage claims.

The reasons advanced for these conclusions, said the court, are irreconcilable. However, relying upon what it declared to be the ''direct holding'' of the Stewart case ''that the Thomas case is not to be regarded as establishing in California the doctrine of 'implied contract' as the basis for the rule of nonliability'', it said there was no necessity ''to make a

judicial declaration as to the doctrine which should be considered as forming the proper basis for the rule . . . If it can be successfully urged that a proper determination of the question requires a declaration of the theory or basis upon which the rule may be foundationed, reason and the weight of authority would furnish an adequate basis in the doctrine of public policy, the considerations in support of which would seem to be more convincing and less vulnerable to attack than those advanced in support of any of the other theories which have had judicial sanction." (PP. 339, 340.)

Another action brought against a hospital by a patron who paid regular rates is *Armstrong* v. *Wallace,* 8 Cal. App. (2d) 429 [47 Pac. (2d) 740]. After stating that the plaintiff's right to recover was governed by the rules stated in the Thomas and Burdell cases, the court held that the plaintiff had no right of action. But a judgment for the defendant, given upon granting a motion for a directed verdict, was reversed in the case of *England* v. *Hospital of Good Samaritan,* 16 Cal. App. (2d) 640 [61 Pac. (2d) 48]. The jury should have been allowed to decide, said the court, whether the hospital was in fact conducted for profit, as charged by the plaintiff, or was operated only for charity. It also said: "We cannot hold that one who, without knowledge that a hospital claims to be a charitable institution and therefore exempt from liability, applies for admission and is received as a patient, paying the regular rates at which the hospital derives a profit, is without redress for injuries occasioned by negligence on the part of the employees of the hospital on the theory that he is accepting the benefits of charity from a benefactor." This conclusion was based entirely upon the statement in the Stewart case that if the rule of nonliability were followed, "the defendant could hardly claim to be relieved of responsibility, for the reason that the plaintiffs had no knowledge whatever of the charitable character of the organization".

In the last case of this character, *Hallinan* v. *Prindle,* 17 Cal. App. (2d) 656 [62 Pac. (2d) 1075], a judgment in favor of the plaintiff, who had been a paying patient, was reversed. However, the decision was limited to the question whether the hospital was conducted as a charity. "It is not disputed," said the court, "that if properly classed as such it cannot be held liable for the negligent acts of its employees if it has used due care in their selection . . ." (P. 669.)

Although practically all of the reported cases in California concern the rights of a hospital in a suit brought by a patron to recover damages, other charitable organizations have also claimed exemption from liability. For example, in *Young* v. *Boy Scouts of America,* 9 Cal. App. (2d) 760 [51 Pac. (2d) 191], the plaintiff was denied a recovery upon the authority of the Thomas, Stewart, and Ritchie cases. Later, a church which operated a boys' club was relieved from liability. (*Bardinelli* v. *Church of All Nations,* 23 Cal. App. (2d) 713 [73 Pac. (2d) 1264].)

The rule of nonliability has also been urged in defense of suits brought against charitable organizations by employees and persons, not patrons, who were injured through the negligence of an employee. In the case of *Phoenix Assur. Co.* v. *Salvation Army,* 83 Cal. App. 455 [256 Pac. 1106], the plaintiff's assignors were injured when an employee of the charity negligently operated an automobile. A judgment for the plaintiff was affirmed notwithstanding the defendants' claim that it was exempt from liability "because of the purpose for which it exists and because of the trust character of the funds at its disposal." Pointing out that "the cases in the other states of the Union are in hopeless irreconcilability" and "the courts of this state have never espoused either side of the discussion", Presiding Justice Works said: "The courts which have declared for the exemption of a charitable institution from liability for torts of which strangers to the charity are the victims have shown an unnecessary solicitude for the welfare of such organizations and of their beneficiaries. . . . We think this state should not be added to the list of those whose courts have encouraged—as in some degree they surely have—the agents of charitable institutions to render less than due care for the security of life, limb, and property, the very things which it is the sole purpose of such institutions to preserve and protect." (PP. 461, 462.)

Summarizing these decisions, it is apparent that the District Courts of Appeal have followed the *dicta* of this court in the Thomas and Stewart cases except in *Phoenix Assur. Co.* v. *Salvation Army, supra,* and *England* v. *Hospital of Good Samaritan, supra.* In the first case, the doctrine that a charitable organization should have exemption was ex-

pressly repudiated so far as strangers to the trust are concerned; in the later one the same court refused to apply it against a paying patient who was not shown to have knowledge of the hospital's asserted charitable character. And although the rule was recognized in the comparatively recent decision of *Lewis* v. *Young Men's Christian Assn.*, 206 Cal. 115 [273 Pac. 580], the court said, quoting from the Thomas case, that the defendant could not rely upon it in the absence of allegation and proof, as an affirmative defense, that reasonable care was used in selecting the servants whose negligence caused the injuries for which damages were claimed.

Apparently all of the cases, except *Levy* v. *Superior Court, supra,* and *Shane* v. *Hospital of the Good Samaritan, supra,* decided by the District Courts of Appeal which hold that a charitable organization should not be liable upon the principle of *respondeat superior,* are based upon the theory of implied contract as stated by this court in the Thomas case. In the Levy case the trust fund doctrine was said to be controlling. Because of the minority of the plaintiff in the Shane case, the court mentioned three other theories, but declined to choose between them other than to say that "reason and weight of authority would furnish an adequate basis in the doctrine of public policy".

Considering these various legal principles, the first, in point of time, was announced about one hundred years ago, when the English courts held that as property donated and held for charitable purposes constitutes a trust fund, it would be inconsistent to allow that property to be used for the payment of tort claims. (*Heriot's Hosp.* v. *Ross,* 12 Clark & F. 507, 8 Eng. Reprint 1508; *Holliday* v. *Vestry of St. Leonards,* 142 Eng. Reprint 769.) This doctrine has been followed in the United States (*Parks* v. *Northwestern University,* 218 Ill. 381 [75 N. E. 991, 4 Ann. Cas. 103, 2 L. R. A. (N. S.) 556]; *Adams* v. *University Hospital,* 122 Mo. App. 675 [99 S. W. 453]; *Eads* v. *Young Women's Christian Assn.,* 325 Mo. 577 [29 S. W. (2d) 701]; *Powers* v. *Massachusetts Homeopathic Hospital,* 109 Fed. 294 [47 C. C. A. 122, 65 L. R. A. 372]), although the same court which first stated it, later declared that the rule is too unsatisfactory for continued approval. (*Mersey Docks & Harbor Trustee* v. *Gibbs,* L. R. 1 Eng. & Irish App. Cases 93, 11 H. L. Cases 686, 11 Eng. Reprint 1500.) The theory has also been examined and repudiated

by a number of American courts. (*Hospital of St. Vincent v. Thompson*, 116 Va. 101 [81 S. E. 13, 51 L. R. A. (N. S.) 1025]; *Henry W. Putnam Memorial Hospital v. Allen*, 34 Fed. (2d) 927; *Bruce v. Young Men's Christian Assn.*, 51 Nev. 372 [277 Pac. 798]; *Cohen v. Gen. Hospital*, 113 Conn. 188 [154 Atl. 435]; *Basabo v. Salvation Army*, 35 R. I. 22 [85 Atl. 120, 42 L. R. A. (N. S.) 1144]; *Kellogg v. Church Charity Foundation*, 138 App. Div. 214 [112 N. Y. Supp. 566].) Certainly it is inconsistent with the usual rules concerning trust funds, which have been held liable for tort claims arising because of the negligence of carefully selected servants (*In re Raybould*, [1900] 1 Ch. 199; *In re Hunter*, 151 Fed. 904; Bogert, "Trusts", sec. 87), although judgment must first be obtained against the trustee. (*Benett v. Wyndham*, 4 De. G. F. & J. 258; *Hordern v. Salvation Army*, 199 N. Y. 233 [92 N. E. 626, 139 Am. St. Rep. 889, 32 L. R. A. (N. S.) 62].)

The American Law Institute's Restatement of the Law of Trusts summarizes the decisions upon this subject as follows: "A person receiving benefits under a charitable trust against whom a tort is committed in the course of the administration of the trust cannot reach trust property and apply it to the satisfaction of his claim, unless the trustee was personally at fault." In commenting upon this rule, the Restatement declares: "This is true whether the person who was injured paid for the benefits which he received or not." (Sec. 402e.)

It is conceded that the foregoing summarizes the conclusions which have been reached in a large majority of the cases upon this question. However, the illustration given by the Institute of the rule's application assumes that "A bequeaths money to B in trust to establish and maintain a hospital." This goes back to the theory upon which the rule was first promulgated in England, that where one endows a hospital for charitable purposes, the money or property of the trust cannot be used to pay damages awarded to one who suffers injuries at the hands of an employee in whose selection due care has been used. But the modern hospital is rarely maintained upon the donation of one charitably disposed individual. It is a business enterprise, which although it may be the recipient of some donations, is able to carry on its work because the aggregate amount received from paying patients is sufficient to meet the expense of ministering to

those patients and also to a certain number who are accepted at a reduced rate or without any charge.

The appellant is a typical example of such an organization. Although the Sisters of Charity originally contributed some capital to their enterprise in buying the land upon which the first hospital buildings were erected, they have since acquired property of very substantial value from the institution's operations. It is probably typical of many other hospitals which through good management and the support of a particular group of citizens, have made a financial success. Such institutions are most necessary for human welfare. But the change in their status from that of the hospital founded upon one person's generosity, which was in existence at the time the trust fund doctrine was first announced, to the modern organization which, in its economic aspects is nonprofit rather than charitable in character, is unquestionably the reason why some courts no longer follow the doctrine of nonliability. Those which cling to the old rule see only an institution founded, as described in the Restatement, when "A bequeaths money to B in trust to establish and maintain a hospital" and apply that rule without a thorough consideration of fundamental principles which present-day needs require.

However, the most severe criticism of the trust fund theory is that, if logically applied, the property of the charitable organizations must enjoy complete immunity from all claims, regardless of the status of the injured plaintiff. (*Hospital of St. Vincent* v. *Thompson,* 116 Va. 101 [81 S. E. 13, 51 L. R. A. (N. S.) 1025]; *Thomas* v. *German Gen. etc. Soc., supra; Phoenix Assur. Co.* v. *Salvation Army, supra; Love* v. *Nashville Agrl. & Normal Institute,* 146 Tenn. 550 [243 S. W. 304, 23 A. L. R. 887].) If one paying the rates charged by a hospital for care may not recover for negligence because the institution is organized for charitable purposes, the trust fund rule should logically bar a recovery by one who is not a patron of the institution, such as a person injured by an automobile driven by the organization's servant, or an employee injured during the course of his employment. Yet in most jurisdictions all persons except patrons are allowed a right to recover in a tort action. (Actions by third persons— *Phoenix Assur. Co.* v. *Salvation Army, supra; Basabo* v.

*Salvation Army,* 35 R. I. 22 [85 Atl. 120, 42 L. R. A. (N. S.) 1144] ; *Murtha* v. *New York H. M. Col. & Flower Hospital,* 228 N. Y. 183 [126 N. E. 722]. Actions by servants—*Cowans* v. *North Carolina Baptist Hospitals,* 197 N. C. 41 [147 S. E. 672] ; *Geiger* v. *Simpson M. E. Church,* 174 Minn. 389 [219 N. W. 463, 62 A. L. R. 716].) Also patrons may recover against the trust fund if the hospital was negligent in selecting its employees (*Lewis* v. *Young Men's Christian Assn.,* 206 Cal. 115, 117 [273 Pac. 580] ; *Georgia Baptist Hosp.* v. *Smith,* 37 Ga. App. 92 [139 S. E. 101] ; *Tribble* v. *Missionary Sisters of S. H.,* 137 Wash. 326 [242 Pac. 372]), which is likewise inconsistent with the theory that property devoted to a charitable purpose may not be dissipated by the payment of damages for torts.

█ Another theory which has been stated in support of the rule of exemption is that of implied contract. Such a contract, as defined by the Civil Code "is one, the existence and terms of which are manifested by conduct". (Sec. 1621.) "In general an implied contract, in no less degree than an express contract, must be founded upon an ascertained agreement of the parties to perform it, the substantial difference between the two being in the mere mode of proof by which they are to be respectively established. The law will imply that a party did make such a stipulation as under the circumstances disclosed, he ought, upon the principles of honesty, justice and fairness to have made. Of course, all the circumstances actually surrounding the parties in the particular transactions are to be carefully considered before this implication of a promise is to be indulged." (*Smith* v. *Moynihan,* 44 Cal. 53, 62, 63; *Jennings* v. *Bank of California,* 79 Cal. 323 [21 Pac. 852, 12 Am. St. Rep. 145, 5 L. R. A. 233] ; *Sacramento Box & Lumber Co.* v. *Rosenberg Bros. & Co.,* 109 Cal. App. 56 [292 Pac. 146] ; Addison's Law of Contracts, 11 ed., 447.) The true implied contract, then, consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words. (*Dunham-Carrigan-Hayden Co.* v. *Thermoid Rubber Co.,* 84 Cal. App. 669 [258 Pac. 663] ; Williston on Contracts, vol. 1, sec. 3.) For example, conduct may form the basis for a novation although there is no express writing or agreement (*Producers' Fruit Co.* v. *Goddard,* 75 Cal. App. 737 [243 Pac. 686]) ; the assignee of a contract becomes bound

to perform its obligations without express agreement when full performance has been received by him (*Weidner* v. *Zieglar*, 218 Cal. 345 [23 Pac. (2d) 515]; *Robinson* v. *Rispin*, 33 Cal. App. 536 [165 Pac. 979]); the assumption of a mortgage debt may be implied. (*Hopkins* v. *Warner*, 109 Cal. 133 [41 Pac. 868]; *White* v. *Schader*, 185 Cal. 606 [198 Pac. 19, 21 A. L. R. 499].) In many other situations, the law will impose certain legal consequences from the conduct of the parties.

However, before a contract may be implied, it must be determined, as a question of fact, whether the parties acted in such a manner as to provide the necessary foundation for it, and evidence may be introduced to rebut the inferences and show that there is another explanation for the conduct. (*Wojahn* v. *National Union Bank*, 144 Wis. 646 [129 N. W. 1068]; *Carlson* v. *City of Marshalltown*, 212 Iowa, 373 [236 N. W. 421]; *Sacramento Box & Lumber Co.* v. *Rosenberg Bros. & Co.*, 109 Cal. App. 56 [292 Pac. 146]; 33 Harv. L. Rev. 376.) But in exempting a charitable organization from liability on the basis of implied contract, courts have required only proof concerning the eleemosynary character of the corporation. (*Shane* v. *Hospital of Good Samaritan, supra; Hallinan* v. *Prindle, supra.*) It is said that by accepting the services of a hospital which is not organized for profit but to benevolently serve the public, one impliedly exempts "the benefactor" from liability, even if he pays the full amount demanded for the services rendered to him. This is fallacious reasoning which can only be justified by ignoring the principles governing implied contract.

To find an implied contract by the patron in the purpose of the charitable organization is to entirely disregard other factors which should be considered in determining whether any such agreement may be inferred from the conduct of the parties. There is no reason for a court to say that admission to a hospital is proof of an intention not to charge it with responsibility for tortious wrongdoing. Indeed, the agreement to pay the rates charged by the hospital for its services would ordinarily be sufficient basis for the opposite inference; certainly it is a strong indication that the patient did not agree that the charity should be exempt if injury resulted from the failure of its servants to act with ordinary care.

(*England* v. *Hospital of the Good Samaritan, supra.*) There may be other acts and circumstances which would also tend to show that the patient had no such intentions. Moreover, the fact that the rule of nonliability has been consistently stated as relieving the charity if its servants have been selected with due care, indicates that the implied contract doctrine has been used to rationalize a result and is not based upon the intention of the parties, as legal principle requires.

■ Some courts have denied recovery against a charitable organization upon the ground that the rule of *respondeat superior* should not be applied to it because the institution receives no private benefit from the acts of its servants. But no one is obliged by law to assist a stranger, even though he can do so by a mere word, and without the slightest danger to himself. However, once he has undertaken to render assistance the law imposes upon him a duty of care toward the person assisted. (Restatement of Law of Torts, sec. 324; *McLeod* v. *Rawson*, 215 Mass. 257 [102 N. E. 429, 46 L. R. A. (N. S.) 547]; *Hoyt* v. *Tilton*, 81 N. H. 477 [128 Atl. 688, 120 A. L. R. 1525.)

It has also been said that public policy either allows or requires the exemption of charities from tort liability. (*Duncan* v. *Nebraska Sanitarium & Benevolent Assn.*, 92 Neb. 162 [137 N. W. 1120, Ann. Cas. 1913E, 1127, 41 L. R. A. (N. S.) 973]; *Currier* v. *Trustees of Dartmouth College*, 105 Fed. 886; *Morrison* v. *Henke*, 165 Wis. 166 [160 N. W. 173].) According to this view, the charity must be preserved for the public benefit. However, Professor Harper, in his book "The Law of Torts", points out that "the immunity of charitable corporations in tort is based upon very dubious grounds". Continuing, he concludes: "It would seem that a sound social policy ought, in fact, to require such organizations to make just compensation for harm legally caused by their activities under the same circumstances as individuals before they carry on their charitable activities. The policy of the law requiring individuals to be just before generous seems equally applicable to charitable corporations. To require an injured individual to forego compensation for harm when he is otherwise entitled thereto, because the injury was committed by the servants of a charity, is to require him to make an unreasonable contribution to the charity, against his will, and a rule of law imposing such burdens can not be regarded as

socially desirable nor consistent with sound policy." (Sec. 294.)

No rule of law may be justified if the theories advanced to support it lack a foundation of legal principle, and, as has been shown, the exemption of a charitable organization from liability for injuries suffered by a paying patient through the negligence of an employee would logically require the same exemption from the tort claims of others. That many courts have refused to consistently apply the rule of nonliability is conclusive evidence of the fallacious reasoning which is advanced in its behalf. On the contrary, other courts have declared that the charitable organization must respond in damages to the paying patient whom it injures. (*Mulliner* v. *Evangelischer Diakonniessenverein*, 144 Minn. 392 [175 N. W. 699]; *Tucker* v. *Mobile Infirmary Assn.*, 191 Ala. 572 [68 So. 4, L. R. A. 1915D, 1167]; *City of Shawnee* v. *Roush*, 101 Okl. 60 [223 Pac. 354]; *University of Louisville* v. *Hammock*, 127 Ky. 564 [106 S. W. 219, 128 Am. St. Rep. 355, 14 L. R. A. (N. S.) 784]; *Sessions* v. *Thomas Dee Memorial Hospital Assn.*, 89 Utah, 222 [51 Pac. (2d) 229]; *Gilbert* v. *Corp. of Trinity House*, L. R. 17 Q. B. Div. 795.) This is not only the modern view but the one required by every principle of common justice. As one court has said: "It is a principle of law as well as of morals that men must be just before they are generous." (*Tucker* v. *Mobile Infirmary Assn., supra.*)

The judgment is affirmed.

Curtis, J., Gibson, J., Carter, J., and Waste, C. J., concurred.

Houser, J., concurred in the judgment.

SHENK, J., Dissenting.—I dissent.

I cannot agree with the prevailing opinion for two principal reasons. In the first place, I challenge the test of exemption from liability based on the ability of the patient to pay. A poor man is just as much entitled to good treatment at a hospital as a rich one and is just as much in need of it. (Compare *Robinson* v. *Pioche, Bayerque & Co.*, 5 Cal. 460, 461.)

In the second place the reasoning and conclusions of the prevailing opinion are contrary to the declared policy of this

state and the overwhelming weight of authority elsewhere on the question of exemption from liability of charitable institutions. If such an important change in state policy, affecting as it does the substantive rights of the parties to this type of litigation, is to be brought about, it should be done by the legislature and not by the courts.

An extensive research has disclosed that the prevailing rule, though based on varying reasons, favors the exemption of charitable institutions from liability to the beneficiaries thereof, either pay or nonpay, for the torts of servants who have been carefully selected. Identity of conclusion reached, though by different reasoning, may be accepted as strong proof of the correctness of the rule. It is reasonably safe to say that less than eight states have held that charitable institutions are liable for the negligence of their employees on the same basis as private profitmaking corporations. Among the small number of jurisdictions appearing to so declare are Alabama, Oklahoma, Minnesota, Florida, Georgia and Rhode Island, the latter apparently having by statute since adopted the majority rule as regards charitable hospitals. (*Southern Meth. Hospital* v. *Wilson*, 45 Ariz. 507 [46 Pac. (2d) 118, 121]; 33 A. L. R. 1369, 1370.) Practically all of the remaining states, on one ground or another, have granted exemption to charitable hospitals from tort liability for the negligence of their servants at least as regards the beneficiaries of such charity, whether they be nonpaying, true charity patients or patients obtaining the benefit of the charity's facilities though paying all or a part of the rate established by it for those financially able to pay. We are not here concerned with the liability or nonliability of a charitable institution to its employees or to strangers who have not in any way availed themselves of its facilities. It is interesting to note, however, that most of the jurisdictions which grant exemption as to the two classes of beneficiaries just above mentioned, deny such exemption as to employees of and strangers to the charity. (*Phoenix Assur. Co.* v. *Salvation Army*, 83 Cal. App. 455 [256 Pac. 1106], [stranger injured on street by defendant's automobile]). It is not necessary to consider or determine the propriety of the rule which denies exemption in the case of employees and strangers. That problem is not here involved.

. . .

In applying the general doctrine of exemption as regards beneficiaries of a charity practically all jurisdictions do so upon the premise that the charitable institution as a part of its affirmative defense of nonliability has established that it exercised due care in the selection of the servant or employee whose negligence is sought to be imputed to it. In other words, the authorities generally recognize that such an institution is not liable for the negligence of its servants if it has exercised reasonable care in their selection and retention. (*Lewis* v. *Young Men's Christian Assn.*, 206 Cal. 115, 116 [273 Pac. 580]; *Roberts* v. *Ohio Valley Gen. Hosp.*, 98 W. Va. 476 [127 S. E. 318, 42 A. L. R. 968]; *Ritchie* v. *Long Beach Com. Hosp.*, 139 Cal. App. 688, 691 [34 Pac. (2d) 771]; *Old Folks etc. Home* v. *Roberts*, 83 Ind. App. 546 [149 N. E. 188]; *Carver C. College* v. *Armstrong*, 103 Okl. 123 [229 Pac. 641, 109 A. L. R. 1202.)  Upon the trial of the present cause the plaintiff conceded that the defendant hospital had exercised due care in the selection of its nurses.

Research discloses that the cases applying the exemption doctrine fall into several categories. The first group bases the rule on what is known as the "trust fund theory". *Parks* v. *Northwestern University*, 218 Ill. 381 [75 N. E. 991, 4 Ann. Cas. 103, 2 L. R. A. (N. S.) 556], is typical of the cases basing the rule on this theory and expounds it is follows: "The funds and property thus acquired are held in trust, and cannot be diverted to the purpose of paying damages for injuries caused by the negligent or wrongful acts of its servants and employees to persons who are enjoying the benefit of the charity.  An institution of this character, doing charitable work of great benefit to the public without profit, and depending upon gifts, donations, legacies and bequests made by charitable persons for the successful accomplishment of its beneficial purposes, is not to be hampered in the acquisition of property and funds from those wishing to contribute and assist in the charitable work by any doubt that might arise in the minds of such intending donors as to whether the funds supplied by them will be applied to the purposes for which they intended to devote them, or diverted to the entirely different purpose of satisfying judgments recovered against the donee because of the negligent acts of those employed to carry the beneficent purpose into execution."

Other cases espousing this theory or reason as the basis of the exemption rule are: *Adams* v. *University Hospital*, 122 Mo. App. 675 [99 S. W. 453]; *Gable* v. *Sisters of St. Francis*, 227 Pa. 254 [75 Atl. 1087, 136 Am. St. Rep. 879]; *Roosen* v. *Peter Bent Brigham Hosp.*, 235 Mass. 66 [126 N. E. 392, 14 A. L. R. 563]; *Parks* v. *Northwestern University*, 218 Ill. 381 [75 N. E. 991, 4 Ann. Cas. 103, 2 L. R. A. (N. S.) 556]; *Cook* v. *John H. Norton Mem. Infirmary*, 180 Ky. 331 [202 S. W. 874]; *Jensen* v. *Maine E. & E. Inf.*, 107 Me. 408 [78 Atl. 898, 33 L. R. A. (N. S.) 141]; 10 Am. Jur. 695, sec. 146. It is true, as pointed out in the majority opinion, that the trust fund theory has been criticized in some jurisdictions of late years upon the ground that the early English cases first pronouncing it (*Heriot's Hosp.* v. *Ross*, 8 Eng. Reprints 1508; *Holliday* v. *Vestry of St. Leonard's*, 142 Eng. Reprint 769) have been disapproved in principle (*Mersey Docks Trustees* v. *Gibbs*, 11 Eng. Reprint 1500), and upon the further ground that no diversion of trust funds may logically be said to result from payment of damage claims, for the donor reasonably must have contemplated such claims being made against an operating charity. However, in spite of such criticism, the "trust fund theory" of charitable exemption finds definite expression in the American Law Institute's Restatement of the Law of Trusts wherein, after recognizing the exceptions above mentioned as to employees and strangers, it is declared in section 402, subdivision 3, that "A person receiving benefits under a charitable trust against whom a tort is committed in the courts of the administration of the trust cannot reach trust property and apply it to the satisfaction of his claim, unless the trustee was personally at fault." (This last qualifying phrase would cover the situation, mentioned above, where there has been a lack of care in the selection of the employee.) In comment "f" thereunder it is stated that "If in the administration of a charitable trust a tort is committed against a person who receives benefits under the trust, he cannot reach trust property and apply it to the satisfaction of his claim if the trustee was not personally at fault. This is true whether the person who was injured paid for the benefits which he received or not. Persons receiving benefits under a charitable trust include such persons as patients in a hospital, pupils in a school, inmates of a home." Among the "illustrations" given under

the foregoing comment, is the following: "5. A bequeaths money to B in trust to establish and maintain a hospital. Owing to the negligence of a nurse employed by the hospital, C, a patient, is injured. *Whether C is a paying patient or is treated gratuitously, he cannot obtain satisfaction of his claim out of the trust property, if B was not personally at fault.*" Again, in comment "h" it is pointed out that "A person receiving benefits from the corporation, whether or not he pays for such benefits, cannot maintain an action of tort against the corporation, unless the board of management of the corporation was at fault. . . . Thus, if a charitable corporation is organized to conduct a hospital, a patient in the hospital, *whether he is a paying patient or not,* cannot maintain an action against the corporation for injuries resulting from negligence, unless the board of management was at fault, as for example, in negligently employing or retaining incompetent employees, or in permitting the premises to be in a dangerous condition, or in failing to make proper rules for the operation of the hospital." In its attempt to minimize the effect of the Restatement, the majority opinion points out that the illustrations given therein have to do solely with endowed charities. Necessarily this is so, for the trust fund theory of charitable exemption from its inception has had particular application to endowed charities. But, as shall presently be shown, there are other theories of exemption applicable alike to all charitable institutions, whether endowed or not. Obviously, charities are not restricted to the endowed type. Regardless of the method of its establishment, the test of whether an institution is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit or private advantage.

Another theory advanced in support of the rule of tort non-liability of charitable organizations is that of "implied waiver". The reasoning underlying this theory is well and succinctly expressed in *Powers* v. *Massachusetts Homeopathic Hospital,* 109 Fed. 294 [47 C. C. A. 122, 65 L. R. A. 372], wherein it is stated "That a man is sometimes deemed to assume a risk of negligence, so that he cannot sue for damages caused by the negligence, is familiar law. Such . . . are the cases of athletic sports and the like. . . . One who accepts the benefit either of a public or of a private charity enters into a relation which exempts his benefactor from lia-

bility for the negligence of his servants in administering the charity; at any rate, if the benefactor has used due care in selecting those servants. To paraphrase the illustration put by the learned judge before whom this case was tried, it would be intolerable that a good Samaritan, who takes to his home a wounded stranger for surgical care, should be held personally liable for the negligence of his servant in caring for that stranger. Were the heart and means of that Samaritan so large that he was able, not only to provide for one wounded man, but to establish a hospital for the care of a thousand, it would be no less intolerable that he should be held personally liable for the negligence of his servant in caring for any one of those thousand wounded men. We cannot perceive that the position of the defendant differs from the case supposed. The persons whose money has established this hospital are good Samaritans, perhaps giving less of personal devotion than did he, but, by combining their liberality, thus enabled to deal with suffering on a larger scale. If, in their dealings with their property appropriated to charity, they create a nuisance by themselves or by their servants, if they dig pitfalls in their grounds and the like, there are strong reasons for holding them liable to outsiders, like any other individual or corporation. The purity of their aims may not justify their torts; but, if a suffering man avails himself of their charity, he takes the risks of malpractice, if their charitable agents have been carefully selected.'' Some of the many other authorities that adopt this theory of ''implied waiver'' or ''implied contract'' are: *Schloendorff* v. *Society of N. Y. Hospital*, 211 N. Y. 125 [105 N. E. 92, Ann. Cas. 1915C, 581]; *Jensen* v. *Maine E. & E. Infirmary*, 107 Me. 408 [78 Atl. 898, 33 L. R. A. (N. S.) 141]; *Hearns* v. *Waterbury Hosp.*, 66 Conn. 98 [33 Atl. 595, 31 L. R. A. 224]; *McDonald* v. *Massachusetts Gen. Hosp.*, 120 Mass. 432, 21 Am. Rep. 529]; *Morrison* v. *Henke*, 165 Wis. 166 [160 N. W. 173]; *Magnuson* v. *Swedish Hosp.*, 99 Wash. 399 [169 Pac. 828]; 10 Am. Jur. 694, sec. 145.

In this state most of the authorities that have extended immunity to charitable institutions from tort liability for the acts of their servants have done so upon this theory. In *Thomas* v. *German Gen. etc. Soc.*, 168 Cal. 183, 188 [141 Pac. 1186], though *dicta,* it was stated by a department of this court that ''where one accepts the benefit of

a public or of a private charity he exempts by implied contract the benefactor from liability for the negligence of the servants in administering the charity, if the benefactor has used due care in the selection of those servants''. This declaration was unnecessary to the decision for the court was of the view that regardless of the rule of exemption the defendant was not liable under the ordinary rules pertaining to corporate liability. Moreover, the rule of exemption from liability was inapplicable in the cited case for the injured plaintiff was an employee of the defendant and, as indicated above, practically all of the authorities deny exemption as to employees of and strangers to the charity. However, the quotation is indicative of this court's leaning toward the well-established rule of charitable exemption.

In the later case of *Stewart* v. *California Med. etc. Assn.*, 178 Cal. 418, 422, 423 [176 Pac. 46], the court took occasion to refer to the prior ruling and after declaring its status to be that of *obiter*, stated that it ''cannot be considered as having committed this court to any one of the several theories on which the nonliability of charitable corporations is based, or to the doctrine of nonliability'', concluding that ''It may be noted, however, that if this rule [of exemption based on implied contract] is followed, the defendant could hardly claim to be thereby relieved of responsibility, for the reason that the plaintiffs had no knowledge whatever of the charitable character of the organization.'' Thus it was indicated that it is improper to imply a contract as against one who is without knowledge of the facts from which the implication arises. It must be conceded that this criticism has been leveled at the ''implied contract'' theory of exemption by other authorities, particularly those having to do with plaintiffs who were infants or who were brought to the charitable hospital in an unconscious state and therefore in no mental condition to be a party to a contract, implied or otherwise. (10 Am. Jur. 694, sec. 145, and authorities there cited.) In answer to this criticism some of the proponents of the ''implied contract'' theory of exemption have countered with the assertion that the contract is not one implied in fact but in law. Research reveals that no exception was made in favor of minors in the following cases: *Weston's Admx.* v. *Hospital of St. Vincent of Paul*, 131 Va. 587 [107 S. E. 785, 23 A. L. R. 907]; *Hogan* v. *Chicago L. Hosp.*, 335 Ill. 42 [166 N. E. 461];

*Parks v. Northwestern University, supra.* In *Shane* v. *Hospital of Good Samaritan,* 2 Cal. App. (2d) 334, 340 [37 Pac. (2d) 1066], an order granting a new trial to plaintiff, *a minor,* was reversed with directions to enter judgment on the verdict for the defendant hospital, there held to be a charitable institution. Regardless of the criticism to which the "implied contract" theory has been subjected, it must be held that the discussion and criticism thereof in the Stewart case, *supra,* was unnecessary for it there definitely appeared, and the trial court had found that the defendant hospital was itself negligent (as distinguished from the negligence of one of its servants) in that it failed to provide the necessary equipment; and further that it had been operated for thirteen years "without having at any time received any charity patients". Obviously, either one of these elements would serve to deprive the hospital there involved of immunity from tort liability for the acts of its servants. The opinion recognized this for it concluded that "It is, therefore, unnecessary to pass upon the nonliability of public charities for negligence or the reasons therefor."

Since the decisions in the Thomas and Stewart cases, *supra,* there has accumulated in this state a series of decisions by the District Courts of Appeal (in some of which this court has denied hearings) wherein it is definitely announced that charitable institutions are exempt from tort liability to beneficiaries thereof upon the theory of "implied waiver" or "implied contract". Among the cases so holding, may be cited: *Burdell* v. *St. Luke's Hosp.,* 37 Cal. App. 310 [173 Pac. 1008] ; *Stonaker* v. *Big Sisters Hosp.,* 116 Cal. App. 375, 379 [2 Pac. (2d) 520] ; *Ritchie* v. *Long Beach Community Hosp.,* 139 Cal. App. 688, 691 [34 Pac. (2d) 771] ; *Armstrong* v. *Wallace,* 8 Cal. App. (2d) 429, 433 [47 Pac. (2d) 740] ; *Bardinelli* v. *Church of All Nations,* 23 Cal. App. (2d) 713, 715 [73 Pac. (2d) 1264]. All but the last cited case involved injuries to *paying* patients in charitable hospitals, as does the present case. The fact that they had paid the established rates was held to be immaterial to the issue of exemption if the institution was charitable in character.

In the citation and discussion of California cases advancing the theory of "implied waiver" or "implied contract" as the reason underlying the doctrine of exemption of charitable institutions, I have purposely refrained from referring to the

two decisions in *England* v. *Hospital of Good Samaritan*, appearing in 16 Cal. App. (2d) 640 [61 Pac. (2d) 48], and 22 Cal. App. (2d) 226 [70 Pac. (2d) 692], for that case is now pending in this court and will be disposed of simultaneously with the present case, though by separate opinion.

A third theory advanced by many of the cases for exempting charitable institutions is based on the asserted inapplicability of the doctrine of *respondeat superior.* It is well expressed in the case of *Hearns* v. *Waterbury Hosp.,* 66 Conn. 98 [33 Atl. 595, 603, 31 L. R. A. 224]. "But we think the drift of all the cases clearly indicates a general conviction that an eleemosynary corporation should not be held liable for an injury due only to the neglect of a servant, and not caused by its corporate negligence in the failure to perform a duty imposed on it by law, and we are satisfied that this general conviction rests on sound legal principles. . . . The law which makes one responsible for an act not his own, because the actual wrongdoer is his servant, is based on a rule of public policy. . . . The rule is distinguished as the doctrine of *respondeat superior* . . . [which] is bottomed on the principle that he who expects to derive the advantage from an act done for him by another must answer for any injury which a third person sustains from it. . . . This defendant does not come within the main reason for the rule of public policy which supports the doctrine of *respondeat superior.* It derives no benefit from what its servant does, in the sense of that personal and private gain which was the real reason for the rule. Again, so far as the persons injured are concerned, especially if they be patients at the hospital, the defendant does not "set the whole thing in motion", in the sense in which that phrase is used as expressing a reason for the rule. Such patient, who may be injured by the wrongful act of a hospital servant, is not a mere third party, a stranger to the transaction. He is rather a participant. The thing about which the servants are employed is the healing of the sick. This is set in motion, not for the benefit of the defendant, but of the public. Surely, those who accept the benefit, contributing also by their payments to the public enterprise, and not to the private pocket of the defendant, assist as truly as the defendant in setting the whole thing in motion. . . . We are now asked to apply this rule, for the first time, to a class of masters distinct from all others, and who do not and cannot come

within the reason of the rule. In other words, we are asked to extend the rule, and to declare a new public policy, and say: On the whole, substantial justice is best served by making the owners of a public charity, involving no private profit, responsible, not only for their own wrongful negligence, but also for the wrongful negligence of the servants they employ only for a public use and a public benefit. We think the law does not justify such an extension of the rule of *respondeat superior*. . . . It is enough that a charitable corporation like the defendant, whatever may be the principle that controls its liability for corporate neglect in the performance of a corporate duty, is not liable, *on grounds of public policy*, for injuries caused by personal wrongful neglect in the performance of his duty by a servant whom it has selected with due care; but in such case the servant is alone responsible for his own wrong. This result . . . is reached, for one reason or another, by the greater number of courts that have dealt with this particular liability of a corporation for public or charitable purposes.''

Research also discloses decisions that advance other and less known theories for exempting charitable institutions. They need not here be mentioned. Regardless of the variant reasons actually expressed in the many cases on the subject, I am convinced that underlying all of them is an expression of public policy, as declared in the last quoted case. In *Shane* v. *Hospital of Good Samaritan, supra,* it is said that ''reason and the weight of authority would furnish an adequate basis in the doctrine of *public policy,* the considerations in support of which would seem to be more convincing and less vulnerable to attack than those advanced in support of any of the other theories which have had judicial sanction''. See, also, *D'Amato* v. *Orange Mem. Hosp.,* 101 N. J. L. 61 [127 Atl. 340] ; *Ettlinger* v. *Trustees of R-M. College,* 31 Fed. (2d) 869; *Bodenheimer* v. *Confederate M. Assn.,* 68 Fed. (2d) 507.

I am satisfied that the established doctrine of exemption presents a rule of sound public policy which, though it may do an injustice in individual cases, tends to encourage the establishment and maintenance of charitable institutions by advising those financially contributing thereto or exerting their efforts therein that the same will not be diverted from the

original purpose of charity to pay for the negligence of the employees of such an institution, provided always that the management thereof uses reasonable care in the selection of its employees. In jurisdictions which grant such exemption from liability, and as shown, and conceded in the majority opinion, they constitute the overwhelming weight of authority, the general rule (almost equally overwhelming) is that the fact that the institution receives pay from some of its beneficiaries detracts nothing from its charitable character and does not change the rule in regard to its exemption from liability, either as to paying or nonpaying patients. (*Armstrong* v. *Wallace*, 8 Cal. App. (2d) 429, 433 [47 Pac. (2d) 740]; *Hallinan* v. *Prindle*, 17 Cal. App. (2d) 656, 669 [62 Pac. (2d) 1075]; *Ritchie* v. *Long Beach Com. Hosp.*, 139 Cal. App. 688, 690 [34 Pac. (2d) 771]; *Greatrex* v. *Evangelical D. Hosp.*, 261 Mich. 327 [246 N. W. 137, 86 A. L. R. 487]; *Adams* v. *University Hosp.*, 122 Mo. App. 675 [99 S. W. 453]; *Gable* v. *Sisters of St. Francis*, 227 Pa. 254 [75 Atl. 1087, 136 Am. St. Rep. 879]; *Taylor* v. *Protestant Hosp. Assn.*, 85 Ohio St. 90 [96 N. E. 1089, 39 L. R. A. (N. S.) 427]; *Southern Meth. Hosp.* v. *Wilson, supra; Nicholas* v. *Evangelical Deaconess Home,* 281 Mo. 182 [219 S. W. 643]; *Duncan* v. *Nebraska Sanitarium,* 92 Neb. 162 [137 N. W. 1120, Ann. Cas. 1913E, 1127, 41 L. R. A. (N. S.) 973]; *St. Vincent's Hosp.* v. *Stine,* 195 Ind. 350 [144 N. E. 537, 33 A. L. R. 136]; 11 C. J. 304; 10 Am. Jur. 700, sec. 151; 109 A. L. R. 1204.) Many of the authorities reasonably hold that the availability to pay patients of the elaborate facilities and expert services of a charitable hospital, which were it not for the charity involved in its creation and maintenance would not be available to anyone, makes the pay patient, as well as the true charity patient, a beneficiary thereof, though perhaps in a lesser degree. (*Weston* v. *Hospital of St. Vincent,* 131 Va. 587 [107 S. E. 785, 23 A. L. R. 907]; *Powers* v. *Massachusetts Homeopathic Hosp.,* 109 Fed. (Mass.) 294 [47 C. C. A. 122, 65 L. R. A. 372]; *Roberts* v. *Ohio Valley Gen. Hosp.,* 98 W. Va. 476 [127 S. E. 318, 42 A. L. R. 968].) In the Roberts case, *supra,* it is stated that "The fact that one is a paying patient does not alter the rule. Such patient is the recipient of the donor's gratuity only in a lesser degree than one who makes no payment. The hospital building, with its equipment, management, and its great possibilities

for the alleviation of suffering, was provided by charity. In using the organization made possible and supported by that charity, a paying patient, to that extent, benefits by the charity.''

In line with the great weight of authority, including many prior decisions in this state, *supra,* I am satisfied that the beneficiaries of such an institution who may have contributed, as did the plaintiff herein, a greater or less sum for the benefits received are not in any different position than those who have received such benefits without charge therefor. The test of the application of the exemption rule is the general nature of the institution and whether it is maintained for the purpose of profit or for that of service, and not the extent or cost of the benefit which the beneficiary has received by availing himself of its privileges. (*McDonald* v. *Massachusetts Gen. Hosp.,* 120 Mass. 432 [21 Am. Rep. 529]; *Southern Meth. Hosp.* v. *Wilson, supra,* 125.) Any other test, as pointed out by several of the cases, would tend to the absurd result of setting up two rules of conduct for the institution, one for pay patients to whom it would be answerable for the negligence of its employees, and another for true charity patients to whom it would not be liable. (*Powers* v. *Massachusetts Homeopathic Hosp.,* 109 Fed. (Mass.) 294, 295 [47 C. C. A. 122, 65 L. R. A. 372].) In this connection it is stated in the last cited case that ''A paying patient in the defendant hospital, as well as a nonpaying patient, seeks and receives the services of a public charity. That such a hospital in its treatment of a rich patient shall be held to a greater degree of care than in its treatment of a pauper is not to be tolerated. Certain luxuries may be given the former, which the latter does not get, and this for various reasons; but the degree of protection from unskilled and careless nurses must be the same in both cases.''

Of course, the burden is always upon the defendant to establish that it is a charitable institution within the meaning of the authorities granting such exemption. The word ''charity'' has a well known and acknowledged meaning. In its truest and broadest sense charity redounds to the general public good and is not confined to any one class or group. In *Estate of Merchant,* 143 Cal. 537 [77 Pac. 475], charity is defined as a gift for the benefit of an indefinite number of persons, either by bringing their hearts under the influence

of education or religion, by relieving their bodies from disease, suffering or constraint, or assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burden of government." See, also, *Dingwell* v. *Seymour,* 91 Cal. App. 483 [267 Pac. 327], where it is stated that "A gift to establish and maintain a public institution where the misery and unhappiness of any person of high or low degree, rich or poor, may be considered and sanely dealt with would come within the purview of the definition of a public charity." An act or feeling of benevolence underlies all charity. When charity is to be extended, not sporadically and to a few individuals, but to a large number over a long period of time, it is generally administered by some association, corporation or institution whose principal and distinctive features are that they have no capital stock and no provisions for the distribution of dividends or profits but, on the contrary, hold their assets and operate their facilities in trust for the obligation of the institution. In other words, the test of whether an institution is charitable is whether it exists to carry out a purpose recognized in law as charitable, or whether it is maintained for gain, profit, or private advantage. (*Hearns* v. *Waterbury Hosp.*, 66 Conn. 98 [33 Atl. 595, 31 L. R. A. 224]; *Gitzhoffen* v. *Sisters of Holy Cross,* 32 Utah, 46 [88 Pac. 691, 8 L. R. A. (N. S.) 1161]; *McDonald* v. *Massachusetts Gen. Hosp.,* 120 Mass. 432 [21 Am. Rep. 529]; *Southern Meth. Hosp.* v. *Wilson, supra.*) In the McDonald case, *supra,* it is stated that "its affairs are conducted for a great public purpose—that of administering to the comfort of the sick, without any expectation, on the part of those immediately interested in the corporation, of receiving any compensation which will enure to their own benefit, and without any right to receive such compensation. This establishes its character as a public charity."

Substantially the same test has been announced in prior decisions in this state. (*Armstrong* v. *Wallace,* 8 Cal. App. (2d) 429 [47 Pac. (2d) 740]; *Hallinan* v. *Prindle,* 17 Cal. App. (2d) 656, 666 [62 Pac. (2d) 1075]; *Dingwell* v. *Seymour, supra.*) In the Armstrong case, *supra,* wherein it appeared that the Sisters of St. Joseph of Orange, were operating a hospital which received, as here, both pay and charity patients (the plaintiff therein being a pay patient)

and wherein, as here, the articles of incorporation referred to the charitable purpose of the corporation and wherein the evidence, as here, disclosed that no one in connection with the corporation received any salary or profits and wherein it appeared that "if there was anything left after the operation of the hospital it went toward the upkeep of the institution locally and then for the benefit of the order at large", the hospital was held to be charitable in character. In reversing an order granting a new trial to the plaintiff in that case, the appellate court declared that "the fact that Mrs. Armstrong paid the regular rates charged by the hospital for paying patients did not take it out of the class of charitable institutions, as the amount paid was not received to build up a profit but to assist in the carrying on of the general charitable purposes of the order".

In the Hallinan case, *supra*, the court held the defendant Mills Memorial Hospital to be a charitable institution on the ground that it was incorporated as a nonprofit corporation and "it has no stock nor stockholders; its directors, managers and officers charged with the conduct of its affairs serve without pay; poor, needy injured persons, without distinction of class or creed, are admitted to the hospital and treated either without charge or to the extent of part only of the cost of the service rendered. To persons able to pay a moderate charge for their care a rate of four dollars a day for a bed in a ward [same as plaintiff herein paid], and a charge of six dollars a day for a room, were established. . . . Notwithstanding this the financial statements of the institution's operations have shown annually an excess of expenditures over receipts with the exception of two years—in one of which the so-called profit was used to purchase new equipment."

The charitable character of the institution involved in *Stonaker* v. *Big Sisters Hospital*, 116 Cal. App. 375, 378, 379 [2 Pac. (2d) 520], was described in the following terms: "It appears without contradiction that the hospital paid no compensation to its constituents for services, and that it paid no dividends; that it was conducted for the good of the community, by a charitable organization known as the Big Sisters League, with the intent and purpose that if there was a surplus over and above the expense of carrying it, such surplus would go to the said League."

The case of *Southern Meth. Hosp.* v. *Wilson*, 51 Ariz. 424 [77 Pac. (2d) 458, 460, 461], declares that "If the purpose of the institution is one which is recognized in law as charitable, and if it is not maintained for the private gain, profit, or advantage of its organizers, officers or owners, directly or indirectly, we think the institution is properly characterized as a charitable one, notwithstanding the fact that it charges for most, if not all, of the services which it may render, so long as its receipts are devoted to the necessary maintenance of the institution and the carrying out of the purpose for which it was organized." To the same effect see *McDonald* v. *Massachusetts Gen. Hosp., supra; City of Dallas* v. *Smith,* 130 Tex. 225 [107 S. W. (2d) 872, 878]; *Williams* v. *Church Home etc.,* 223 Ky. 355 [3 S. W. (2d) 753, 62 A. L. R. 721]. In *Brattleboro Retreat* v. *Brattleboro,* 106 Vt. 228 [173 Atl. 209], the fact that none of the patients of a hospital were cared for without charge was said not to deprive it of its charitable character. And, in *In re Rust,* 168 Wash. 344 [12 Pac. (2d) 396], it was stated that by the great weight of authority "mere profit to the corporation itself, it having no stockholders to share such profit and no one standing in any proprietary relation to it to share in such profit, does not make such corporation other than a charitable corporation". The last two were tax cases.

I am satisfied that the defendant hospital corporation satisfies the requirements set down in the authorities for that of a charitable institution. Its articles of incorporation after stating its purpose to be the establishment of one or more hospitals for the care and treatment of the sick and disabled, declared that it "shall not have any capital stock" and that the members and officers "shall derive no pecuniary profit therefrom", adding that pecuniary profit "never shall be the object of this corporation". The evidence also disclosed that its membership was restricted to the Sisters of Charity of Providence who received no compensation, other than room and board, for their services; that they admit to the hospital any and all patients without question, many of whom are full or part charity patients; that they do other forms of charity in the way of maintaining a clinic and furnishing meals and financial assistance to those applying for the same, the details of which need not here be stated; and that at no time during the seven-year period prior to plaintiff's injuries

had they received more than they paid out and that had a profit been realized it would "revert to the institution for buying more accommodations and to expand the facilities of the hospital". Under the evidence, and within the meaning of the authorities, the defendant hospital, in my opinion, should be held to be a charitable institution and exempt from liability to its patients, including pay patients, for the torts of its servants. As stated, the true test is the general nature of the institution and whether it is maintained for the purpose of profit or for that of service, and not the extent or cost of the benefit which the patient or beneficiary has received by availing himself of its privileges. Inasmuch as the evidence indicates that the average cost of maintaining a patient was $7.56 a day, it is doubtful whether the $4 a day rate paid by plaintiff entailed a "profit" as found by the trial court. But, even if it did the fact would be immaterial if, as indicated, the "profit" merely served to foster the charitable objective of the institution—its general nature being that of service to the afflicted rather than the accumulation and distribution of profits.

Rehearing denied. Shenk, J., voted for a rehearing.